UNITED STATES of America,
Plaintiff–Appellee,

v.

Thomas Morocco HAGER,
Defendant–Appellant.

Hope House; The Children's Law Center; Scholarchips; Yasmine Arrington; The Osborne Association; National Resource Center on Children and Families of the Incarcerated, Amici Supporting Appellant.

No. 08–4.

United States Court of Appeals,
Fourth Circuit.

Argued: Jan. 31, 2013.

Decided: June 20, 2013.

**ARGUED:** Barry Joseph Fisher, Office of the Federal Public Defender, Albany, New York, for Appellant. James L. Trump, Office of the United States Attorney, Alexandria, Virginia, for Appellee. **ON BRIEF:** Robert Tucker, Arlington, Virginia, for Appellant. Neil H. Mac-Bride, United States Attorney, Alexandria, Virginia, Richard D. Cooke, Assistant United States Attorney, Office of the United States Attorney, Richmond, Virginia, for Appellee. Paul M. Thompson, Jennifer R. Taylor, Thomas J. Tynan, McDermott Will & Emery LLP, Washington, D.C., for Amici Supporting Appellant.

Before DUNCAN, WYNN, and FLOYD, Circuit Judges.

Affirmed by published opinion. Judge FLOYD wrote the majority opinion, in which Judge DUNCAN joined. Judge WYNN wrote a dissenting opinion.

FLOYD, Circuit Judge:

Appellant Thomas Morocco Hager appeals his conviction and capital sentence for intentionally killing Barbara White while engaged in a drug trafficking conspiracy in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2. We have jurisdiction pursuant to 28 U.S.C. §§ 1291, 21 U.S.C. § 848(q), and 18 U.S.C. § 3595. Because we discern no reversible error, we affirm both the conviction and the sentence.

## I.

Hager was convicted of and sentenced to death for killing White while engaged in a drug trafficking conspiracy in violation of

21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2. The trial consisted of three parts: (1) the guilt-innocence phase, (2) the death penalty eligibility phase, and (3) the sentencing selection phase.

The government adduced evidence of the following facts during the first phase of the trial: In November 1993, Hager was engaged in the sale and distribution of crack cocaine at Nelson Place, in the Southeast area of Washington, D.C. In October 1993, he shot and wounded Christopher Fletcher and Ric Pearson, two members of a drug gang from Ely Place, over a dispute about one of his guns. Ely Place is a few blocks from Nelson Place. After the shooting, Hager went into hiding, living with his then-girlfriend, Shenita King, in her apartment in Maryland.

After the shooting, sometime in mid-November, White stopped by King's apartment. King did not allow White into the apartment, however, and did not tell her that Hager was there. Even so, Hager was very upset because no one was to know where he lived. White had previously dated and had a child with Williams Seals, a member of the Ely Place drug gang. Because Hager feared that White would tell others of his whereabouts, he decided that he would kill her.

On November 29, 1993, Hager, King, Arlington Johnson, and Lonnie Barnett went to White's Alexandria, Virginia, apartment. When they arrived that evening, King knocked on White's patio door. White, who was feeding her thirteen-month-old baby daughter Alexis, invited them in.

Shortly after they arrived, White showed King and Hager Alexis's room. She then took a brief telephone call. Shortly after the call, Hager turned up the volume on the television, pulled out a gun, and hit White's face with enough force to break her jaw and knock out a tooth. He

and Barnett then took White, crying and bleeding, down the hallway to her bedroom. Hager told Johnson to run some water in bathtub. All the while, King stayed in the living room with Alexis. Throughout the ordeal, Hager repeatedly asked White whether she told her baby's father, Seals, where Hager lived. White insisted that she had not.

Hager sat White on the bed and instructed Barnett to find something with which to gag her. After he gagged her, he and Barnett walked her to the bathroom. Hager told her to get in the bathtub and then grabbed some hot curlers, plugged them in, and threw them into the water, attempting unsuccessfully to electrocute White. Next, he told Johnson and Barnett to go to the kitchen and retrieve some knives with which to stab White. They followed his instructions. All told, the three stabbed her over eighty times in her legs, chest, neck, face, hands, buttocks, and back. After some of the knives broke or bent, Hager instructed Johnson and Barnett to retrieve more knives.

At some point, Hager put White face down into the water and stood on top of her to make sure that she was dead. When Barnett insisted that they go, Hager "said that he couldn't leave because he could get the death penalty for it, and he wanted to make sure that she was dead."

After Hager was convinced that White was dead, he, King, Johnson, and Barnett proceeded out the door, but not before taking the telephone off of the hook and locking the door behind them, leaving Alexis alone in the apartment with her dead mother.

On their way back to the District, Hager counseled the others not to tell anyone about the murder and teased Barnett for being scared. He also mocked White's pleas for her life and her concern for Alex-

is. He later bragged that Johnson and Barnett "were soldiers now, and that [they] go hard."

Hager's five-week three-phrase trial occurred in October 2007. He did not testify at any point in the trial. At the conclusion of the first phase, the guilt-innocence phase, the jury found Hager guilty of the intentional killing of White while engaged in a conspiracy to distribute fifty grams or more of crack cocaine, in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2. Thereafter, during the second phase of the trial, the death penalty eligibility phase, the jury unanimously found beyond a reasonable doubt that Hager "was eighteen (18) years of age or older at the time of the offense charged in the indictment," that he "intentionally killed Barbara White," and that the following statutory aggravating factors (or aggravators) were present:

Thomas Morocco Hager:

(1) has been convicted of another offense resulting in the death of a person, for which a sentence of life imprisonment was authorized by statute.

(2) has been convicted of two other offenses punishable by a term of imprisonment of more than one year, committed on different occasions, involving the infliction of, or attempted infliction of, serious bodily injury upon another person.

(3) knowingly created a grave risk of death to a person in addition to Barbara White in the commission of the offense and in escaping apprehension for the offense.

(4) committed the offense charged after substantial planning and premeditation.

(5) distributed a controlled substance, namely crack cocaine, to a juvenile.

(6) committed the offense charged herein in an especially heinous, cruel, or depraved manner in that it involved torture and serious physical abuse to Barbara White.

Based on these factors, the jury found Hager statutorily eligible for the death penalty. *See* 18 U.S.C. § 3593(c) (setting forth the procedure for proving the existence of the statutory aggravating factors); 21 U.S.C. § 848(n)(1994) (amended by Pub.L. No. 109–77, § 221(2) (2006)) (listing the statutory aggravating factors).

Finally, in the third phase of the trial, the sentencing phase, the jury was called upon to determine whether the statutory aggravating factors and the non-statutory aggravating factors sufficiently outweighed the mitigating factors (or mitigators), both statutory and non-statutory. Although the jury was required to find the aggravators unanimously and beyond a reasonable doubt, any number of jurors could find a mitigator by a preponderance of the evidence and then those jurors could consider that mitigator in deciding whether to vote for a sentence of life or death.

The non-statutory aggravating factors and mitigating factors, both statutory and non-statutory, are as follows:

### NON–STATUTORY AGGRAVATING FACTORS

. . . .

(1) On or about April 23, 1990, the defendant, juvenile at the time, possessed with the intent distribute cocaine. He was found guilty by adjudication on or about September 18, 1990.

. . . .

(2) From in or about 1992, and continuing until at least in or about 1997, the defendant repeatedly bought and sold cocaine and crack cocaine in and around Washington, D.C., and directed others to buy and sell cocaine and crack cocaine. The defendant illegally obtained, possessed, used, and carried numerous firearms in relation to and in furtherance of

his drug trafficking activities. The defendant regularly used violence and threats of violence to further and protect his drug business.

. . . .

(3) On or about October 22, 1993, the defendant shot and severely wounded Christopher Fletcher and Ric Pearson, two rival drug dealers, in Washington, D.C.

. . . .

(4) On or about March 30, 1995, the defendant killed Jerome Robinson.

. . . .

(5) On or about February 26, 1996, the defendant directed Loneldon Weldon, his cousin, to kill Cornell Coplin. Coplin died as a result of the shooting.

. . . .

(6) On or about October 20, 1996, the defendant killed Londell Duvall.

. . . .

(7) On or about March 15, 2003, while incarcerated at U.S.P. Pollock, a penitentiary, the defendant was observed hitting another inmate during a large scale prison fight, which resulted in a prison lock down.

. . . .

(8) On or about April 27, 2004, while incarcerated at U.S.P. Pollock, the defendant was disciplined for possession of a dangerous weapon, an eight-inch long metal shank with a sharpened point on one end.

. . . .

(9) On or about June 29, 2004, while incarcerated at U.S.P. Pollock, a penitentiary, the defendant was observed hitting and kicking another inmate during a prison fight, which resulted in a prison lock down.

. . . .

(10) The defendant's statements and actions following the murder of Barbara White reflect a lack of remorse.

. . . .

(11) The defendant poses a future danger to others in that he is likely to commit, and to direct others to commit, additional acts of violence in any setting.

. . . .

(12) The defendant caused injury, harm and loss to the victim and the victim's family and friends, as evidenced by the victim's personal characteristics and by the impact of her death upon the victim's family and friends.

. . . .

## MITIGATING FACTORS

. . . .

A. Statutory Mitigating Factors

(1) Thomas Morocco Hager was youthful, although not under the age of 18.

__0__ Number of jurors who so find

(2) Others, equally culpable in the crime, will not be punished by death because their age at the time of the offense renders them statutorily ineligible for the crime.

__0__ Number of jurors who so find

(3) Factors in Thomas Morocco Hager's background or character mitigate against imposition of the death sentence.

__2__ Number of jurors who so find

B. Non–Statutory Mitigating Factors

(1) If not sentenced to death, Thomas Morocco Hager will be punished by a sentence of life imprisonment with no possibility of release.

__5__ Number of jurors who so find

(2) Arlington Johnson will not be sentenced to death for his role in the murder of Barbara White, because his age at the time of the offense renders him statutorily ineligible for the death penalty.

__0__ Number of jurors who so find

(3) Lonnie Barnett will not be sentenced to death for his role in the murder of Barbara White, because his age at the time of the offense renders him statutorily ineligible for the death penalty.

 0 Number of jurors who so find

(4) Shenita King will not be sentenced to death for her role in the murder of Barbara White.

 0 Number of jurors who so find

(5) The fact that Lonnie Barnett's plea agreement includes the possibility that the government will ask the Court to reduce his sentence is something that weighs against imposition of a sentence of death for Thomas Morocco Hager.

 0 Number of jurors who so find

(6) The fact that Arlington Johnson's plea agreement includes the possibility that the government will ask the Court to reduce his sentence is something that weighs against imposition of a sentence of death for Thomas Morocco Hager.

 0 Number of jurors who so find

(7) The offer of immunity for Shenita King in this case is something that weighs against imposition of a sentence of death for Thomas Morocco Hager.

 0 Number of jurors who so find

(8) ... [T]he fact that Williams Seals kept guns and money in a safe in Barbara White's apartment constitutes a mitigating factor.

 1 Number of jurors who so find

(9) ... [T]he evidence fails to establish Thomas Morocco Hager's guilt of a capital crime with sufficient certainty to justify imposition of a sentence of death.

 0 Number of jurors who so find

(10) ... [T]he evidence establishes that it was Thomas Morocco Hager's belief that William Seals was out to kill him and that fact constitutes a mitigating factor.

 0 Number of jurors who so find

(11) The Bureau of Prisons has facilities adequate to monitor and prevent any future assaults and violent conduct by Thomas Morocco Hager.

 0 Number of jurors who so find

(12) A sentence of life imprisonment without the possibility of release is severe and exacts both significant physical restraint and hardship as well as great psychological pain, particularly because Thomas Morocco Hager is left for years to contemplate his wrongdoing and to feel the loss of his children, friends and family.

 2 Number of jurors who so find

(13) A sentence of life imprisonment without the possibility of release is severe because Thomas Morocco Hager is a young man who, based upon his life expectancy, reasonably can expect to serve decades of confinement.

 1 Number of jurors who so find

(14) If incarcerated, Thomas Morocco Hager is unlikely to represent a continuing danger to society, as he is already showing signs of "aging out."

 0 Number of jurors who so find

(15) Demonstrated factors in Thomas Morocco Hager's childhood, background and character recommend against the imposition of the death sentence and recommend in favor of life imprisonment without the possibility of release.

 7 Number of jurors who so find

(16) The imposition of a life sentence without the possibility of release would preserve the opportunity for Thomas Morocco Hager to remain available to his daughters through their adolescent years and beyond.

 11 Number of jurors who so find

(17) Thomas Morocco Hager has proven himself to be capable of having a positive relationship with his daughters.

 0 Number of jurors who so find

(18) Thomas Morocco Hager's childhood experiences include being prematurely sexualized by his uncle.

 0 Number of jurors who so find

(19) Thomas Morocco Hager's childhood circumstances led to his leaving school when he was a young adolescent.

 0 Number of jurors who so find

(20) Thomas Morocco Hager's parents offered no supervision when he was a young child.

 10 Number of jurors who so find

(21) At the time of Barbara White's death, Thomas Morocco Hager had no prior adult convictions.

 0 Number of jurors who so find

(22) Thomas Morocco Hager's childhood was filled with risk factors.

 9 Number of jurors who so find

(23) Thomas Morocco Hager's childhood enjoyed few protective factors.

 8 Number of jurors who so find

Upon weighing the aggravating factors, both statutory and non-statutory, against the mitigating factors, both statutory and non-statutory, the jury found that the aggravators sufficiently outweighed the mitigators and, thus, recommended that Hager be sentenced to death. Pursuant to the verdict, the district court sentenced Hager to death. *See* 21 U.S.C. § 848(1)(1994). This appeal followed.

## II.

■ Hager first contends that the evidence adduced at trial was insufficient to convict him under § 848(e)(1)(A). We conduct a de novo review of challenges to the sufficiency of the evidence supporting a jury verdict, *United States v. Kelly,* 510 F.3d 433, 440 (4th Cir.2007), and will affirm the jury verdict when, "viewing the evidence in the light most favorable to the prosecution, [it] is supported by 'substantial evidence,' " *United States v. King,* 628 F.3d 693, 700 (4th Cir.2011) (quoting *United States v. Smith,* 451 F.3d 209, 216 (4th Cir.2006)). Substantial evidence is such "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Burgos,* 94 F.3d 849, 862 (4th Cir.1996) (en banc). "We review questions of fact, other than the ultimate question of guilt, for clear error. Determinations of the meaning of statutory phrases, however, constitute legal conclusions that we review de novo." *United States v. Peoples,* 698 F.3d 185, 189 (4th Cir.2012) (emphasis omitted) (citations omitted). As both the Supreme Court and this Court have recognized, "appellate reversal on grounds of insufficient evidence ... will be confined to cases where the prosecution's failure is clear." *Id.* (quoting *Burks v. United States,* 437 U.S. 1, 17, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978)) (internal quotation marks omitted).

Defendant was indicted under 21 U.S.C. § 848(e)(1)(A), which provides:

[A]ny person engaging in or working in furtherance of a continuing criminal enterprise [ (CCE) ], or any person engaging in an offense punishable under section 841(b)(1)(A) of this title or section 960(b)(1) of this title who intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of an individual and such killing results, shall be sentenced to any term of imprisonment, which shall not be less than 20 years, and which may be up to life imprisonment, or may be sentenced to death.

There are three prongs to this statute. *See United States v. Aguilar,* 585 F.3d 652, 657 (2d Cir.2009). The first prong covers those who intentionally kill someone while

"engaging in . . . a [CCE]." *Id.* (quoting 21 U.S.C. § 848(e)(1)(A)) (internal quotation marks omitted). The second prong concerns the one who intentionally kills another while "working in furtherance of a [CCE]." *Id.* (quoting 21 U.S.C. § 848(e)(1)(A)) (internal quotation marks omitted). And, the third prong envelops that person who intentionally kills another while " 'engaging in an offense punishable under section 841(b)(1)(A) . . . or section 960(b)(1)' of Title 21, *e.g.,* while manufacturing, distributing, or imposing large quantities of drugs, *see id.* §§ 841(b)(1)(A), 960(b)(1), or conspiring to do so." *Id.* at 657–58 (quoting 21 U.S.C. § 848(e)(1)(A)). We are concerned here with the third prong.

■ As a preliminary matter, Hager maintains that § 848(e)(1)(A) applies only to substantive drug offenses and, thus, is inapplicable to a drug conspiracy such as the one we have here. But this is simply not so. Conspiracy to distribute and possess with intent to distribute more than fifty grams of crack cocaine is "an offense punishable under section 841(b)(1)(A)." 21 U.S.C. § 848(e)(1)(A); *see id.* § 846 ("Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.") Thus, "the penalties established under § 841(b) apply with equal force to attempts and conspiracies to violate the object offenses set forth in § 841(a)." *United States v. Irvin,* 2 F.3d 72, 75 (4th Cir.1993)

As to his main argument, Hager is correct in his contention that a conviction under § 848(e)(1)(A) requires evidence tying White's murder to his drug trafficking charge. But, according to Hager, there is an insufficient relationship between the murder and his drug dealing to support

the § 848(e)(1)(A) conviction because "there was no allegation that he was selling drugs or otherwise involved in any narcotics activity when White was killed." "If the 'engaging in' element required only the defendant's membership in the conspiracy," Hager contends, "then Section 848(e)(1)(A), as written, would reach any intentional killing during that period." On this point, we are unpersuaded.

As the district court aptly noted, "Section 848(e)(1)(A) applies to killings done while engaging in an *offense,* not an act, punishable under § 841. An offense, of course, involves much more than a single act. The statute therefore is not limited to killings that are contemporaneous with an act constituting a § 841 offense." *United States v. Hager,* 521 F.Supp.2d 533, 536 (E.D.Va.2007); *see also United States v. Santos,* 541 F.3d 63, 68 (2d Cir.2008) ("So long as the defendant enters into the unlawful agreement before the killing, and the conspiracy is ongoing when the killing occurs, the drug-offense and killing elements of section 848(e)(1)(A) are satisfied by independent acts that overlap in time."). The district court also correctly observed that this Court recognized in *United States v. Tipton,* 90 F.3d 861, 868–70 (4th Cir.1996), albeit indirectly, the applicability of § 848(e) in a situation in which the intentional killing did not occur contemporaneous to the drug trafficking activity. In *Tipton,* of the seven murders committed, none occurred during a drug transaction. *Id.* at 868–70. We are bound by that precedent.

So, what sort of connection is required between the drug offense and the murder? When interpreting this statute, "Courts [have] universally concluded that a substantive, and not merely temporal, connection is required . . . to sustain a conviction under § 848(e)(1)(A)." *Aguilar,* 585 F.3d at 658. "[A] substantive connection [be-

tween the murder and the drug offense] must be implied as an essential element of § 848(e)." *Tipton*, 90 F.3d at 887 n. 13.

With the record before us, we are firmly convinced that a reasonable jury "could accept as adequate and sufficient to support a conclusion of [Hager's] guilt beyond a reasonable doubt," *Burgos*, 94 F.3d at 862, that Hager was engaging in an offense punishable under section 841(b)(1)(A) when he killed White and that there was a substantive connection between his drug trafficking conspiracy and the killing. Although Hager repeatedly argues that White's murder was unrelated to drugs, the evidence introduced at trial tells a different story.

The government presented adequate and sufficient evidence that Hager killed White to eliminate the threat that he felt to himself and to his drug trafficking activities. Hager was engaged in a long-running drug conspiracy to distribute crack cocaine around Nelson Place in Southeast Washington, D.C., at the time that he killed White. Guns are an integral part of the tool chest of those involved in the drug trade. *United States v. Mobley*, 40 F.3d 688, 697 (4th Cir.1994) ("This Court and other courts have long recognized that drug dealers use firearms to protect their narcotics and the large amount of cash in their possession."). In fact, Hager shot Fletcher and Pearson, two members of the Ely drug gang, in a dispute regarding their possession of one of his guns. Seals, the father of White's baby, Alexis, was also a member of the Ely group. Thus, there was evidence in the record on which a reasonable jury could think that Hager killed White specifically because he feared that she might tell the group where Hager lived. A reasonable jury could also find, based on the evidence presented, that Hager killed White to protect and keep others from finding his safe house—which

is what King's apartment had become for him—where he could hide drugs, money and guns. And, a reasonable jury could also find from the evidence that by having his two drug co-conspirators Johnson and Barnett help murder White, Hager purposed to strengthen his relationship with the men and tighten the cohesiveness of his drug organization.

■ "The government has no burden to establish that a drug-related motive was the sole purpose, the primary purpose, or even that it was equally as important as any non-drug-related purpose, as long as it was one purpose." *United States v. Desinor*, 525 F.3d 193, 202 (2d Cir.2008). But here, we need not tease out which of Hager's purposes for killing White were drug-related and which were not. All of Hager's apparent purposes for killing White were intertwined with his drug conspiracy. Thus, it is for these reasons that we hold that the government presented sufficient evidence on which the jury could find the necessary nexus between Hager's drug conspiracy and White's murder to establish a violation of § 848(e)(1)(A).

But, even if that was not enough to sustain Hager's conviction, we note that Hager's trial counsel conceded at the Rule 29 motion hearing in the district court that "clearly, clearly, this killing, based on the evidence that the government has offered, certainly furthered drug trafficking, his conspiracy. It certainly furthered it." Hager's appellate counsel, however, posits that "this comment seemed to refer to the confrontation with Fletcher and Pearson, not the killing of White, since she had no involvement with the stolen gun." We have reviewed the transcript and find nothing to support appellate counsel's contention.

Instead, it appears that Hager's trial counsel admitted that White's murder furthered Hager's drug conspiracy because:

(1) the evidence overwhelmingly demonstrated that fact and (2) trial counsel thought that the government had to establish that a drug transaction occurred at the time of the murder for § 848(e)(1)(A) to apply. Because there was no evidence that any drug activity transpired at the time of White's murder, trial counsel assumed that his acknowledgement was not dispositive. But, of course, although he was mistaken in thinking that a drug transaction had to occur at the time of the murder for liability pursuant to § 848(e)(1)(A), his concession that White's murder furthered Hager's drug conspiracy remains intact.

■ Even with that concession, we note that we find unavailing Hager's arguments that the logic, structure, and history of § 848(e)(1)(A) limit the killings covered by the statute to those committed during or in furtherance of trafficking activities. First, Hager states, "In all reported CCE-murder decisions by this and other circuits, it appears that the killings were found to have been committed 'in furtherance of' the CCE. None applied the 'engaging in' clause to allow a broader form of liability." From this, he concludes, "[A]n 'in furtherance of' relationship between the killing and the CCE thus marks the outer limit on liability for members of these extreme drug conspiracies ... strongly suggests the same must be true for those, like Hager, charged under the other prong of Section 848(e)(1)(A)." But, Hager's argument wholly ignores our long-settled practice of beginning, as we must, with the plain meaning of the statute.

"The starting point for any issue of statutory interpretation ... is the language of the statute itself." *United States v. Bly*, 510 F.3d 453, 460 (4th Cir.2007). "We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) (citations omitted) (quoting *Rubin v. United States*, 449 U.S. 424, 430, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981)).

The third prong of the statute, under which Hager was convicted, provides that any person who intentionally kills an individual while "engaging in an offense punishable under section 841(b)(1)(A) ... or section 960(b)(1) ... may be sentenced to death." § 848(e)(1)(A). There is no ambiguity here. Thus, our inquiry is complete. One such as Hager who intentionally kills someone while engaged in a drug conspiracy is eligible for the death penalty under this statute.

■ Still, Hager contends that if § 848(e)(1)(A) is interpreted to cover murders that occurred neither during nor in furtherance of drug trafficking activity, as in this case, then the statute is void for vagueness under the Due Process Clause of the Fifth Amendment and the Eighth Amendment. He makes constitutional claims pursuant to the Tenth Amendment and the Commerce Clause, as well.

■ We generally review a defendant's challenge to the constitutionality of a statute de novo. *United States v. Bostic*, 168 F.3d 718, 721 (4th Cir.1999). However, when the issue is not presented to the district court, as is the case here, then we review for plain error. *See United States v. Martinez*, 277 F.3d 517, 524 (4th Cir. 2002) ("As a general proposition, ... it is well established that forfeited error is reviewed under a plain error standard."). To secure relief under the plain error standard, a defendant must show "(1) error, (2) that is plain, and (3) that affect[s] substan-

tial rights." *United States v. Thomas*, 669 F.3d 421, 424 (4th Cir.2012) (alteration in original) (quoting *Johnson v. United States*, 520 U.S. 461, 466–67, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997)).

▮ "Due process requires that a criminal statute provide adequate notice to a person of ordinary intelligence that his contemplated conduct is illegal, for 'no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.'" *Buckley v. Valeo*, 424 U.S. 1, 77, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (quoting *United States v. Harriss*, 347 U.S. 612, 617, 74 S.Ct. 808, 98 L.Ed. 989 (1954)). Thus, "the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). However, "[a] statute need not spell out every possible factual scenario with 'celestial precision' to avoid being struck down on vagueness grounds." *United States v. Whorley*, 550 F.3d 326, 334 (4th Cir.2008). "A statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional, but also grave doubts upon that score." *Aguilar*, 585 F.3d at 658 (quoting *United States v. Jin Fuey Moy*, 241 U.S. 394, 401, 36 S.Ct. 658, 60 L.Ed. 1061 (1916)).

As to Hager's Fifth and Eighth Amendment void for vagueness arguments, we are unable to agree. "'Plain' is synonymous with 'clear' or, equivalently, 'obvious.'" *United States v. Olano*, 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). The claimed error here is not clear. As we have already explained, § 848(e)(1)(A) is not ambiguous. Nor is it vague. It states simply that one who in-

tentionally kills another while "engaging in an offense punishable under section 841(b)(1)(A) ... or section 960(b)(1) ... may be sentenced to death." § 848(e)(1)(A). Hence, because "court of appeals cannot correct an error pursuant to Rule 52(b) unless the error is clear under current law," *id.*, we decline Hager's request for relief.

▮ Hager's Tenth Amendment challenge meets the same fate. Although he does not develop the argument, in essence, he argues that a murder such as the one here is normally prosecuted by the Commonwealth of Virginia, not the federal government. Thus, the suggestion is that the federal government has overstepped its powers and violated the Tenth Amendment. But again, the alleged constitutional violation is neither plain, clear, nor obvious.

Concerning Hager's Commerce Clause claim, as noted above, "[A]˙ substantive connection [between the murder and the drug offense] must be implied as an essential element of § 848(e)." *Tipton*, 90 F.3d at 887 n. 13. "Courts require[ ] a 'substantive connection' between the defendant's drug activity and the charged killing in part to address the concern that, absent such a requirement, § 848(e)(1)(A) would be subject to constitutional challenge on Commerce Clause grounds." *Aguilar*, 585 F.3d at 658. Here, as explained above, there was sufficient evidence in the record to support the jury's finding that there was a substantial connection between Hager's drug conspiracy and his murder of White. As such, we find no error.

In sum, the government presented sufficient evidence on which a reasonable jury could convict Hager on the § 848(e)(1)(A) charge. Thus, we find no reversible error.

## III.

We next turn to the issue of whether the district court erred when it rejected Hager's proposed jury instruction concerning the "engaging in" portion of § 848(e)(1)(A). According to Hager, the district court compounded its error by instructing the jury that, to convict, they must find "that the killing was connected to the conspiracy in a meaningful way." This instruction, Hager maintains, is an incorrect statement of the law.

■■■■ A district court's "decision to give (or not to give) a jury instruction ... [is] reviewed for abuse of discretion." *United States v. Russell,* 971 F.2d 1098, 1107 (4th Cir.1992). A district court's decision not to give a requested instruction by the criminal defendant amounts to reversible error only if the proffered instruction: (1) was correct, (2) was not substantially covered by the charge that the district court actually gave to the jury, and (3) involved some point so important that the failure to give the instruction seriously impaired the defendant's defense. *United States v. Lewis,* 53 F.3d 29, 32 (4th Cir.1995). Even if these factors are met, however, failure to give the defendant's requested instruction is not reversible error unless the defendant can show that the record as a whole demonstrates prejudice. *See United States v. Ellis,* 121 F.3d 908, 923 (4th Cir.1997).

We reject Hager's arguments for at least two reasons. First, it would have been improper for the district court to have given Hager's requested charge. And second, the district court's instruction on the "engaging in" element was neither erroneous nor prejudicial.

■■■■ Hager proposed the following instruction to the district court on the "engaging in" portion of § 848(e)(1)(A):

The government must prove beyond a reasonable doubt that at the time Barbara White was killed, the defendant was then actively engaged in a drug trafficking offense punishable under 21 U.S.C. § 841.

You may not find the defendant guilty merely because the defendant was a member of a drug trafficking conspiracy on the day of the offense.

You may not find the defendant guilty if you find Barbara White's death merely furthered the defendant's drug trafficking activities.

You may only find the defendant guilty if you find:

1) Barbara White was killed by the defendant,

2) At the time the defendant killed Barbara White, he was actively engaged in a separate criminal act punishable under 21 U.S.C. § 841, and

3) Barbara White's death was directly related to, and an integral part of, the underlying drug trafficking offense punishable under 21 U.S.C. § 841.

The district court was correct in declining to give this proposed charge as it contains several errors. For example, it required the jury to find that Hager was actively involved in a drug trafficking act at the time of the murder. But, as explained above, this is a misstatement of the law. Moreover, as also explained above, to the extent that the proposed instruction was meant to lead the jury to think that they could not convict Hager because he was engaged in a drug conspiracy at the time of the murder, and not a substantive drug offense, this was also error. Because Hager's proposed instruction was inaccurate, the district court did not abuse its discretion in declining to give it to the jury.

■ As to the instruction that was actually given, the parties dispute whether Hager preserved the alleged error below. If he did, because he alleges that the instruction contains an incorrect statement of the law, our review is de novo. *See United States v. Mouzone,* 687 F.3d 207, 217 (4th Cir.2012). But, if he did not, it is for plain error. Because our determination on this issue is the same under either standard, we need not decide whether the alleged error was preserved.

The district court instructed the jury, in relevant part, as follows:

So, the elements of this crime, murder while engaged in drug conspiracy, are the following. There are five:

One, the government must prove that while a member of and engaged in the drug conspiracy-that while a member of and engaging in the drug conspiracy charged in the indictment, the defendant either intentionally killed the victim or commanded, induced, procured or caused the intentional killing of the victim; that the death of the victim resulted from such activity of the defendant; that the intentional killing was done knowingly, and was connected in a meaningful way to the drug conspiracy; and that the drug conspiracy alleged in the indictment involved the distribution of at least 50 grams of cocaine base, commonly known as crack cocaine.

Now the government is not required to prove beyond a reasonable doubt that a drug transaction was underway at the time of the killing. But the government is required to prove that a drug conspiracy existed at the time of the killing, and that the defendant was a member of the conspiracy, and that the killing was connected to the conspiracy in a meaningful way.

Hager takes great umbrage with the term "meaningful," arguing that it fails to encompass the strength of the connection required between the drug charge and the murder before one can be found guilty of a violation of § 848(e)(1)(A). We cannot agree.

■ Contrary to Hager's contentions otherwise, our review of the record and the relevant law convinces us that the instruction given by the district court effectively elucidates the necessary nexus between Hager's drug conspiracy and White's murder, removing any risk that he or any other "defendant could be found guilty simply on the basis of a temporal coincidence of a murder with a [conspiracy]." *Tipton,* 90 F.3d at 887. Nevertheless, Hager continues to complain that "the jury needed something more definite and confined than simply a 'meaningful' connection, and should be told so." But with this argument, Hager fails to appreciate the fact that a trial court has " 'considerable discretion in choosing the specific wording of [its] instructions,' and we will not reverse unless an instructional error 'is determined to have been prejudicial, based on a review of the record as a whole.' " *See United States v. Whitfield,* 695 F.3d 288, 305 (4th Cir.2012) (quoting *Figg v. Schroeder,* 312 F.3d 625, 640 (4th Cir. 2002)).

■ Here, the instruction was not prejudicial when we consider the record as a whole. As already observed, the government introduced sufficient evidence for a reasonable jury to determine that Hager murdered White in an effort to hide and protect himself from Fletcher and Pearson, members of another drug gang, whom he shot over their possession of one of his guns. Further, as we have already stated, based on the evidence, a reasonable jury could find that Hager killed White to protect and keep others from finding his safe house. And finally, a reasonable jury

could also find from the evidence that by having his two drug co-conspirators Johnson and Barnett help murder White, Hager purposed to strengthen his relationship with the men and tighten the cohesiveness of his drug organization. Thus, even if the district court erred in its selection of the term "meaningful," and we do not think that it did, the error was not prejudicial.

To the argument that the district court should have employed the term "in furtherance of" to describe the necessary nexus to convict Hager under § 848(e)(1)(A), we note that in Hager's proposed instructions to the district court, he stated that the jury could not find him guilty if it found "White's death merely furthered [his] drug trafficking activities." In other words, and as discussed above, according to Hager, whether White's murder was "in furtherance" of his drug conspiracy was insufficient to sustain a conviction under § 848(e)(1)(A). Now, he appears to contradict his earlier argument. But, we need not decide whether "in furtherance of" would have been a better term.

The district court was not required to choose a magic word to describe the necessary nexus, only an appropriately descriptive one. And we think that the word "meaningful" is appropriately descriptive. Yet, as already noted, even if it is not, from our review of the record as a whole, we find no prejudice to Hager because of the district court's use of the word. Simply put, the evidence is overwhelming that there existed the necessary nexus between Hager's drug conspiracy and White's murder such that § 848(e)(1)(A) is applicable. Thus, we find no error in the district court's instruction on that charge.

## IV.

■■■ Hager also argues that the district court abused its discretion by treating the jurors as anonymous in the courtroom.

"[A] district court's decision whether to empanel an anonymous jury is reviewable for abuse of discretion." *United States v. Dinkins*, 691 F.3d 358, 371 (4th Cir.2012).

■■■ In capital cases, an anonymous jury is allowed under very limited circumstances:

A person charged with treason or other capital offense shall at least three entire days before commencement of trial, excluding intermediate weekends and holidays, be furnished with a copy of the indictment and a list of the veniremen, and of the witnesses to be produced on the trial for proving the indictment, stating the place of abode of each venireman and witness, except that such list of the veniremen and witnesses need not be furnished if the court finds by a preponderance of the evidence that providing the list may jeopardize the life or safety of any person.

18 U.S.C. § 3432. This Court has further stated:

[A] district court may empanel an anonymous jury only in rare circumstances when two conditions are met: (1) there is strong reason to conclude that the jury needs protection from interference or harm, or that the integrity of the jury's function will be compromised absent anonymity; and (2) reasonable safeguards have been adopted to minimize the risk that the rights of the accused will be infringed.

*Dinkins*, 691 F.3d at 372. "A lesser degree of anonymity may entail disclosing to the parties the names of the venire members, but identifying them only by number in open court." *Id.* at 371. That is what occurred here: Hager and his counsel received a list of the jury venire, but they were referred to only by number in open court.

 Five factors, commonly referred to as the "*Ross* factors," are helpful in deciding whether there are "strong reasons" for an anonymous jury, *id.* at 373:

(1) the defendant's involvement in organized crime, (2) the defendant's participation in a group with the capacity to harm jurors, (3) the defendant's past attempts to interfere with the judicial process, (4) the potential that, if convicted, the defendant will suffer a lengthy incarceration and substantial monetary penalties, and (5) extensive publicity that could enhance the possibility that jurors' names would become public and expose them to intimidation or harassment.

*Id.* (quoting *United States v. Ross*, 33 F.3d 1507, 1520 (11th Cir.1994)). "However, this list of factors is not exhaustive, nor does the presence of any one factor or set of factors automatically compel a court to empanel an anonymous jury." *Dinkins*, 691 F.3d at 373. Of course, it follows that the absence of any one factor or set of factors will not automatically compel a court not to empanel an anonymous jury.

The district court gave the following reasons for empaneling an anonymous jury: First, it stated, "It has been my experience in cases of this sort that jurors are extremely nervous about their names being known, and they prefer to be addressed by numbers, and to have their names used only when absolutely necessary." The court's rationale is further set forth in the following exchange between the government and the district court:

[ASSISTANT UNITED STATES ATTORNEY (AUSA)]: With respect to the cases dealing with anonymous juries, they do say that the Court should make findings, which the Court has. I would point out that the defendant was convicted of obstruction of justice in one of his cases in Washington,

D.C., and that, almost to a, to a person, every single government witness who has had contact with Mr. Hager has expressed fear about testifying in this case. And to the extent the witnesses have expressed those fears, I could easily see how a juror might express fear in a capital case.

THE COURT: And indeed, that's what you represented to the Court earlier.

[AUSA]: Yes, Your Honor.

THE COURT: And it's on that basis that I make the finding that this is an appropriate case for using numbers and keeping the list under seal, and anonymous, with allowing the defendant the kind of limited contact with the list and the names that I have indicated; namely, that he can assist counsel and look at the list during, during the voir dire and the jury selection, but he cannot have a copy of the list. And I don't want this list getting out.

And when the jurors are selected, their names and addresses are not to be grist for the media mill, or for the use of—improper use of anyone else.

In explaining its decision to the jury venire, the court stated:

Now, we are identifying you by numbers in court, rather than by name, to protect you from contact in the media or other persons, curiosity seekers and the like, to protect you from unwanted publicity and to insure that no outside information is communicated to you through this process and the trial.

And this is so that both parties receive a fair trial.

The fact that we are identifying you by number should have no impact at all on the presumption of innocence that the defendant is entitled to, or any im-

pact in any other way as you consider and decide this case, if you are selected.

*Ross* factors three and four are the most relevant here. As discussed below, factor five ultimately was not an issue.

■ As to factor three, "the defendant's past attempts to interfere with the judicial process," *Ross,* 33 F.3d at 1520, Hager avows that his obstruction conviction arose from an incident approximately a decade earlier and did not involve any sort of threat. But neither the timing of the obstruction nor whether a threat was involved is of any moment here. The concern is whether the defendant has shown a propensity for interfering with the judicial process. He has. Thus, this factor weighs against him.

■ Hager, of course, makes no claim regarding factor four, "the potential that, if convicted, the defendant will suffer a lengthy incarceration and substantial monetary penalties." *Id.* Of course, how could he? This is a capital case in the which the maximum penalty is death. This "potential punishment[ ] lend[s] support to a conclusion that [Hager] had an incentive to resort to 'extreme measures in any effort to influence the outcome of [his] trial.'" *Dinkins,* 691 F.3d at 376 (quoting *United States v. DeLuca,* 137 F.3d 24, 32 (1st Cir.1998)). Thus, this factor also weighs heavily against him. These two reasons alone-that Hager has shown a propensity to improperly interfere with the judicial process and that he was facing the ultimate punishment—are sufficient to meet the first *Dinkins* element that "there is strong reason to conclude that the jury needs protection from interference or harm, or that the integrity of the jury's function will be compromised absent anonymity." *Dinkins,* 691 F.3d at 372.

■ As to the second *Dinkins* element, we observe that the district court did not

tell the jury venire that Hager was not given a copy of the jury venire list. Nor did the district court inform the jury venire or the jury itself that it was taking any precautions to protect the jurors from any potential harm that might be caused by Hager or any of his associates. *See Dinkins,* 691 F.3d at 378.

Instead, the district court told the panel that the reason they were identifying them by numbers in court, as opposed to by name, was "to protect [them] from contact in the media or other persons, curiosity seekers and the like, to protect [them] from unwanted publicity and to insure that no outside information [was] communicated to [them] through th[e] process and the trial." Hager maintains, however, that the court's comments that the jury's anonymity was for the purpose of protecting them from media contact "must have rung false" as "only one suggested any possible exposure to news coverage about the case, and even she was uncertain." According to Hager, the trial "received vanishingly little coverage before or during the trial." Hager's argument lacks merit.

Suffice it to say, the district court gave a neutral non-prejudicial reason for empanelling an anonymous jury. *See Dinkins,* 691 F.3d at 378 ("[T]o protect a defendant tried by an anonymous jury from having the jury conclude that the defendant is a dangerous person from whom the jurors must be protected, courts customarily provide the jury a non-prejudicial reason for their anonymity."). And we think that it was a reasonable one. Contrary to Hager's assertions otherwise, the amount of media coverage that the trial ultimately received does not suggest that jurors would not be contacted by "the media or other persons, curiosity seekers and the like," or that they did not need to be protected from "unwanted publicity" or from having "outside information . . . com-

municated to [them] through this process and the trial."

 Accordingly, we are of the opinion that the district court "properly followed 'the generally accepted practice for minimizing prejudice, which is to downplay (not accentuate) the significance of the juror anonymity procedure.'" *Id.* at 379 (quoting *Ochoa–Vasquez,* 428 F.3d at 1037). And "any remote possibility of harm was mitigated further because the district court properly instructed the jury on the presumption of innocence." *Id.* at 379.

 As noted above, the court instructed the jury venire that the fact that they were being identified by number in court "should have no impact on the presumption of innocence that the defendant is entitled to." Without any evidence to the contrary, we must assume that the jury followed the instructions given to it by the court. *United States v. Runyon,* 707 F.3d 475, 497 (4th Cir.2013) ("[A]bsent some specific 'reason to doubt that the jury ... adhered to the district court's directive,' this [C]ourt will not conclude to the contrary.") (quoting *United States v. Castillo–Pena,* 674 F.3d 318, 322 (4th Cir. 2012)). Hence, for these reasons, we think that the district court satisfied the second *Dinkins* prong—"reasonable safeguards [were] adopted to minimize the risk that the rights of the accused [would] be infringed." *Dinkins,* 691 F.3d at 372.

Hager marshals two other arguments in this section that we need address only briefly. First, he complains that an anonymous jury may have led the jury to think that he was a dangerous person from which it needed to be protected. Jury anonymity, Hager argues, was especially prejudicial to him at sentencing, where his future dangerousness was a contested issue. But, as observed above, the district court explained to the jury venire that they were being referred to by numbers, as opposed to names

> so that both parties receive a fair trial. The fact that we are identifying you by number should have no impact at all on the presumption of innocence that the defendant is entitled to, or any impact in any other way as you consider and decide this case, if you are selected.

Because we assume that juries abide by the instructions given to them, and Hager has given no reason why we should not, we hold that any harm that might have occurred from having an anonymous jury was assuaged by the district court's jury instruction.

Finally, Hager avers that an anonymous jury denied him his Sixth Amendment right to a public trial. But, this was a public trial. And the fact that the jurors were referred to in court by number, and not name, does not make it any less so. If Hager's contentions were true, then anonymous juries would never be allowed. But they are allowed. As detailed above, *Dinkins* not only indicates that we allow them, but also sets forth the standards for doing so.

Hager cites to *Presley v. Georgia,* 558 U.S. 209, 130 S.Ct. 721, 175 L.Ed.2d 675 (2010), for his argument that his right to a public trial was violated. In *Presley,* the trial court had literally closed the voir dire portion of the underlying trial. *Id.* at 722. The Supreme Court observed,

> There are no doubt circumstances where a judge could conclude that threats of improper communications with jurors or safety concerns are concrete enough to warrant closing voir dire. But in those cases, the particular interest, and threat to that interest, must "be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered."

*Id.* at 725 (quoting *Press–Enterprise Co. v. Superior Court of Cal.,* 464 U.S. 501, 510, 104 S.Ct. 819, 78 L.Ed.2d 629 (1986)). We make two observations: First, in *Presley,* the Supreme Court is undoubtedly addressing the issue of public trials, not anonymous juries. But, second, even if we were somehow to say that Hager's trial was not a public one, we would still find that "the particular interest, and threat to that interest, '[was] articulated along with findings specific enough ...,'" *id.* (quoting *Press–Enterprise,* 464 U.S. at 510, 104 S.Ct. 819), that we are able to determine that the court's order was proper.

In sum, the district court did not abuse its discretion in finding that an anonymous jury was necessary, and it took reasonable steps to protect Hager's rights. Thus, because both *Dinkins* factors were satisfied, we find that the district court did not abuse its discretion when it empaneled an anonymous jury.

## V.

▆▆▆▆ Next, Hager posits that district court abused its discretion in seating Juror 144 after questions arose regarding his ability to be fair and impartial. A district court's determination whether to remove a juror for cause will not be overruled except for a "manifest abuse of ... discretion." *Poynter v. Ratcliff,* 874 F.2d 219, 222 (4th Cir.1989). Indeed, its decision not to excuse a juror for cause is entitled to "special deference." *Patton v. Yount,* 467 U.S. 1025, 1038, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984). The critical issue in deciding a challenge for cause is whether the juror "could be fair and impartial and decide the case on the facts and law presented." *United States v. Capers,* 61 F.3d 1100, 1105 (4th Cir.1995).

Hager raises three specific examples of Juror 144 stating that he did not think that he could be impartial. First, when asked in the jury questionnaire whether the fact that this case involved a crime of violence would cause him to question whether he could sit as a fair and impartial juror, Juror 144 answered, "Yes." In explaining his answer, he wrote, "I say yes but only if there is strong evidence against this person. Someone is still dead and someone killed that person. So what is the [e]vidence? Drugs and then someone dies. Why?"

During voir dire, the district court followed up on this question:

> THE COURT: I think the question is sometimes-let me put it to you this way: The evidence in this case will involve a crime of violence, and there will be evidence of violence. Do you believe you can listen carefully to that evidence and evaluate it fairly and impartially as a fair and an impartial juror?

> THE JUROR: Yes, I believe I could.

> THE COURT: Can you explain the answer—would you like to see your answer? Would that help you?

> THE JUROR: No, I remember my answer.

> THE COURT: All right, sir.

> THE JUROR: Basically, I guess the—I guess my problem or issue is with the fact that someone is dead, and it was possibly done during illegal actions. And that is—with me, I kind of look at the victim here. It's kind of, in my head I looked at, you know, the victim, illegal activities; and that is where I have my problems or my issues.

> THE COURT: Do you understand that the government has the burden of proving each and every element of the offense charged: Murder, premeditated murder with malice in the course of drug trafficking? The government has to prove all of that beyond a

reasonable doubt. Do you understand that?

THE JUROR: I understand that.

THE COURT: And the defendant begins with a presumption of innocence; that is, that he is not guilty of this?

THE JUROR: Correct.

THE COURT: Do you think you can give effect to those two instructions?

THE JUROR: Yes, I would try.

THE COURT: Do you think—is there any reason why you wouldn't succeed?

THE JUROR: No, I wouldn't think.

Second, when asked in the questionnaire if he would find it difficult to obey the court's instruction that the defendant is to be presumed innocent until the government has proven each element of the charged offense beyond a reasonable doubt, Juror 144 answered, "Yes." When asked on the form to explain his answer, he stated, "I don't want to say yes, but rather say maybe. It would all depend on the [e]vidence. Drugs and then someone gets killed. Why?"

At voir dire, the district court followed up:

THE COURT: Can you follow that instruction?

THE JUROR: I would definitely try, sir.

THE COURT: Do you think there's any reason you wouldn't succeed?

THE JUROR: I was just trying to answer it. I was trying to read the questions, and answer it the first thing that popped into my mind. And that's how I answered the questions. I didn't give much thought; I just read the question and then answered.

THE COURT: Well, you understand that simply because a death occurred and there might be drugs involved,

that does not mean that the defendant did anything?

THE JUROR: Correct.

THE COURT: And you understand that the government has to prove what the defendant did beyond a reasonable doubt?

THE JUROR: Correct.

THE COURT: Are you—you are able to follow that instruction?

THE JUROR: I would definitely try, yes.

THE COURT: And are you able to follow the instruction that until the jury finds that he is guilty, he is presumed innocent and the jury may not find him guilty[?] You understand that?

THE JUROR: Yes, I do understand it, sir.

THE COURT: Do you think you can follow the instruction that the defendant is presumed innocent unless and until the jury finds otherwise?

THE JUROR: I would definitely try, sir, yes.

THE COURT: Do you know of any reason why you would not succeed in doing that?

THE JUROR: No sir.

Third, at the end of the questionnaire, the following question is posited: "Is there anything about the nature of this case or about any of the questions in this questionnaire that suggests to you that you will not be able to sit as a fair and impartial juror and render a fair and impartial verdict in this matter?" In response, Juror 144 answered, "Yes." In the explanation section, Juror 144 wrote:

I worry about the fact that there were drugs and traffic[k]ing of those drugs. Because of that [illegal] activity someone died? Why did that person [h]ave to die[?] Was she involved or just a per-

son in the wrong place at the wrong time[?] What about her family? 1993? Why so long?

When the district court asked him to explain his answer, he stated,

Sir, it was just—it was just the first things that popped in my head when I was answering this question. Those are just, I guess, questions as to, you know,—you know, illegal drug trafficking, you know, someone's got dead. I think about them, I think about the people who are left behind.

I'm a law-abiding citizen, you know. I've done nothing but worked my whole life. I believe in the legal system. It's just the first things that popped in my head. And then all the questions, then, were in there, as to, okay, was the lady who passed away, was she involved in it? I mean, it just was a bunch of questions I had. That's how I was thinking about this when I answered the question.

The court followed up by asking him whether he could be fair and impartial, to which he responded, "I would definitely try." The court continued:

THE COURT: Do you know of any reason why you wouldn't succeed?

THE JUROR: No, sir.

THE COURT: Let me make sure, again, that you understand that merely because there may be evidence that someone was killed and evidence of drugs, that does not establish that the defendant committed any crime. Do you understand that?

THE JUROR: Yes, sir.

THE COURT: The government has to prove that beyond a reasonable doubt. Do you understand that?

THE JUROR: Yes, sir.

THE COURT: Would you be able to listen carefully and closely to the evidence as it is presented and render a fair and impartial verdict? That is, a verdict that is fair to the government and fair to the defendant?

THE JUROR: I would try, sir.

THE COURT: Again, any reason why you would not succeed?

THE JUROR: No, sir.

Hager places much reliance on *United States v. Thompson*, 744 F.2d 1065 (4th Cir.1984), for his argument that the district court erred by not disqualifying Juror 144. In *Thompson*, after seeing a disturbing picture of a four-month old victim, one of the jurors informed the district court that he was unsure if he "could be totally fair." *Id.* at 1067. The defendants moved for a mistrial, which the district court denied. *Id.* After explaining that it was important that he keep an open mind, reminding the juror of the defendants' presumption of innocence and that it was the government's burden to prove guilt beyond a reasonable doubt, the district court said, " 'So, I will ask you to resume with the case. Do you think you can do so?' [The juror] replied, 'I will try. I am not sure, your Honor.' The judge did not seek an affirmative response but said, 'All right. That is all I can ask.' " *Id.* On review, this Court held that the district court abused its discretion by going forward with the trial after the juror "gave an equivocal response to repeated questions about his ability to proceed with an open mind." *Id.* at 1068.

*Thompson* is of no help to Hager and is easily distinguished. Although Juror 144 and the juror in *Thompson* both initially stated only that they would try to be fair, the district court here followed up by asking if there was any reason that the juror could not be fair. And each time that question was posed, Juror 144 said that there was not. The district court in *Thompson*, however, failed to solicit such a response.

Given the high deference that we are to give the district court in the matter of jury disqualification, we are unable to say that the district court's decision not to seat Juror 144 was a manifest abuse of discretion. To the extent that Juror 144 equivocated by saying that he "would try" to be fair to Hager, the court conscientiously and repeatedly followed up by asking if there was any reason that he would not succeed in his effort. And, each time, Juror 144 answered that there was not.

At the appellate level, we are reviewing a cold record. But the district court was on the scene. It heard Juror 144's words, observed his demeanor, and judged his credibility. Thus, it was in a much better place than we to determine whether Juror 144 was being truthful in his statements that there was no reason why he could not be fair. And so because of the heightened deference that we give to the district court in matters such as this, we will not disturb its decision.

## VI.

■ According to Hager, the district court also erred by excluding certain mitigating testimony from his two daughters. Relying on *United States v. Williams,* 632 F.3d 129 (4th Cir.2011), Hager argues that our review of this claim is de novo, *see id.* at 132 ("This Court reviews evidentiary rulings implicating constitutional claims de novo."). But referring to *United States v. Basham,* 561 F.3d 302 (4th Cir.2009), the government insists that our review is for an abuse of discretion, *see id.* at 325 (stating in a death penalty case: "We review evidentiary rulings of the district court for abuse of discretion."). Because our decision would be the same under either standard, we need not decide this issue.

■ It is well settled that a capital defendant is entitled to submit any mitigating evidence in support of a sentence less than death. *Payne v. Tennessee,* 501 U.S. 808, 822, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).

> [T]he Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of case, not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.

*Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (footnotes omitted). However, the district court is not limited in its ability to exclude as irrelevant evidence that does not bear on the defendant's character, prior record, or the circumstances of the crime. *Id.* at 604 n. 12, 98 S.Ct. 2954.

Hager proposed several mitigating factors concerning his present and future relationship with his daughters and the impact his execution would have on them. He then sought to introduce evidence to support those proposed mitigators. Many of Hager's arguments center around three videotapes that he wished to admit during the sentencing phase of the trial. The first is of a child psychologist and defense expert, Dr. Hope Hill, interviewing Hager's two then-thirteen-year-old daughters, Tonia Thomas and Anika King, about their relationship with their father and the impact his execution would have on them. The second videotape is of Anika and Tonia talking to each other about Hager and their relationship with him. It also contains execution impact testimony. The third videotape shows the two daughters engaged in a telephone conversation with Hager. After some vacillation, the district court ultimately excluded all three of the videotapes.

The district court ruled that the first videotape was too staged, was not subject to cross-examination, and contained execution impact evidence. The court did make clear, however, that Dr. Hill could testify about her interview with the girls. The court found that the second videotape also contained execution impact evidence and was cumulative of the testimony that the daughters would provide at trial. And the court held that the third video amounted to allowing Hager to allocute without being subject to cross-examination. Hager complains that the district court erred in disallowing these videotapes into evidence.

In addition, Hager also argues that the district court committed reversible error in limiting the testimony that Tonia and Anika could offer at the sentencing hearing. In its ruling, the court said:

> I think they're certainly entitled ... to tell the jury ... what their father's involvement in their life has been and whether they feel their father loves them.
>
> . . . .
>
> But their saying they love their father is precisely what gets to the impact on them. It's really about Mr. Hager. It's not about these children. It's about his character.
>
> And, therefore, it's his relationship with his daughters, how he's manifested remaining in their lives. And whether he has manifested love and care for them. That's what you should be focusing on and eliciting.
>
> . . . .
>
> The only ruling that I've really made is that you may not elicit testimony about how they feel about having their father taken away from them, about the death penalty or anything of that sort.

Hager complains:

> the district court's rulings explicitly kept out ... the girls' testimony and proffered video evidence about their love for their father, and about how happy they are, and how important it is to them, to talk with him, see him, and have him in their lives. Instead, ... the defense could only elicit from the girls strictly descriptive testimony, such as whether Hager sends them Christmas cards, how often they see him, and what he asks them about.

In essence, Hager maintains that his constitutional rights were violated by the district court's decision to exclude the above-described evidence. We agree with the district court, however, that the evidence—both the videotapes and the testimony—was correctly barred.

Because most of the arguments concern the introduction of execution impact testimony, whether in the videotapes or the disallowed testimony, we begin there. Contrary to Hager's contentions, we think that allowing a capital defendant to argue execution impact as a mitigator is improper. As the Fifth Circuit recently opined, "Because such evidence 'does not reflect on [the defendant's] background or character or the circumstances of his crime,' 'the Supreme Court has never included friend/family impact testimony among the categories of mitigating evidence that must be admitted' during a capital trial." *United States v. Snarr,* 704 F.3d 368, 401 (5th Cir.2013) (quoting *Jackson v. Dretke,* 450 F.3d 614, 618 (5th Cir.2006)). In contrast, because "victim impact evidence relates to the harm caused by the defendant, *Payne* held that it is relevant to the jury's assessment of 'the defendant's moral culpability and blameworthiness.'" *Id.* at 402 (quoting *Payne,* 501 U.S. at 825, 111 S.Ct. 2597). Although not bound by the Fifth Circuit's ruling, we are persuaded by it.

But, why is victim impact evidence allowed and execution impact on third

parties forbidden? First, "victim impact evidence fundamentally differs from execution impact evidence, which in no way reflects on the defendant's culpability." *Id.* Second, to allow evidence about the impact the execution will have upon a third party goes beyond testimony about the defendant's character, prior record, or the circumstances of the crime. *See Lockett,* 438 U.S. at 604 n. 12, 98 S.Ct. 2954 ("Nothing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense.") And third, the victim of a murder in a capital case is obviously unavailable to provide testimony at trial. Thus, victim impact testimony allows the jury to know about the victim's life. "[J]ustice, though due to the accused, is due to the accuser also. The concept of fairness must not be strained till it is narrowed to a filament. We are to keep the balance true." *Payne,* 501 U.S. at 827, 111 S.Ct. 2597 (quoting *Snyder v. Mass.,* 291 U.S. 97, 122, 54 S.Ct. 330, 78 L.Ed. 674 (1934)).

The capital defendant is available to offer the jury all relevant information as to his life, background, character, and the impact any sentence will have on him. To allow testimony of the impact on third parties, however, does nothing to inform the jury on any of these matters and upsets the balance set forth in *Payne.* And although we are mindful that some federal courts have allowed execution impact testimony, *see e.g., United States v. Wilson,* 493 F.Supp.2d 491 (E.D.N.Y.2007); *United States v. Fell,* No. 2:01crl2-01, 2005 WL 1634067 (D.Vt. July 5, 2005), Hager "cannot point to any federal case requiring admission of 'execution impact' testimony because there are no such cases. *Lockett* does not stand for that principle." *Sten-*

*son v. Lambert,* 504 F.3d 873, 892 (9th Cir.2007).

Still, Hager argues that testimony concerning his daughters' "love for their father, and about how happy they are, and how important it is to them, to talk with him, see him, and have him in their lives" should have been admitted. Although not binding, or directly on point, *Coleman v. Saffle,* 869 F.2d 1377, 1393 (10th Cir.1989), is persuasive. In that habeas case, the court observed, "In the case before us the only evidence that might be considered as mitigating merely constituted statements that the witnesses loved [the defendant]; they in no way concerned an aspect of his 'character or record and any of the circumstances of the offense.'" *Id.* (quoting *Lockett,* 438 U.S. at 604, 98 S.Ct. 2954). Then it went on to explain:

> The statements by Coleman's wife and sister-in-law do not in any way bear on Coleman's background or the circumstances of the offense. The only way they could be considered to bear on Coleman's character is to assume that a wife or sister-in-law would not love him unless he had some good character traits. We doubt that a mother's love is given only to those children who deserve it; we doubt that a wife (or even a sister-in-law) expresses love only for a husband who deserves it. And even if the statement of love implies some good character traits it does not identify what they are. Thus, we hold that the statements here do not constitute "relevant mitigating evidence" on which a jury could base sympathy.

*Id.* The same is true here. Whether Hager's daughters loved him sheds no light on Hager's character, his prior record, or the circumstances of the offense. And we are unable to say that Tonia's and Anika's love for their father is conditioned on whether he had good character traits.

As such, we are unable to say that Hager's daughters' love for him constitutes relevant mitigating evidence.

For the same reason that Hager's daughters' love for their father provides no insight into Hager's character, his prior record, or the circumstances of his offense, the same is true regarding any evidence that the daughters are happy to see him or that it is important to them "to talk with him, see him, and have him in their lives." Hence, because how Hager's daughters feel about their father is not relevant mitigating evidence, the district court did not err in disallowing it.

■ Turning back to the videotapes, we have reviewed the testimony, the court's rulings, and the videotapes and are of the opinion that the first two videotapes were either cumulative of testimony that was or could have been presented or contained testimony that was properly excluded because it constituted execution impact testimony. Moreover, as noted above, the district court allowed that Dr. Hill could testify about her conversation with Tonia and Anika. Although she did not, this was a choice Hager made. For these reasons, we find no constitutional error or abuse of discretion as to the exclusion of those two videotapes.

Concerning the third videotape, in which Hager's daughters talked to him on speakerphone, Hager argues that it should have been admitted because it was not being offered for the truth of the matter asserted and was not an allocution. According to Hager, "[t]he conversation was self-evidently a genuine and highly revealing glimpse of these 13–year–old girls' relationship with their father." We are of the opinion, however, that the district court was well within its discretion in concluding that the probative value regarding Hager's character from the speaker phone conversation was substantially outweighed by the danger that the jury could be confused or misled. But, even if we determined that the district court erred, "[w]e are confident that the jury would have reached the same sentence that it did even if the district court had admitted the [videotape]." *United States v. Lighty*, 616 F.3d 321, 363 (4th Cir.2010) (citation omitted).

Hager's arguments concerning the value that the execution impact testimony would have had in countering the evidence concerning the future dangerousness aggravator and the allegedly extensive victim impact testimony meets the same fate—and for the same reasons: It is not a constitutional violation or an abuse of discretion when a court "exclude[s], as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." *Lockett*, 438 U.S. at 604 n. 12, 98 S.Ct. 2954.

We have no reason to doubt the statements put forth by amici that a defendant such as Hager had to overcome several obstacles to develop a meaningful relationship with Tonia and Anika and that he has the potential to overcome those obstacles and help Tonia and Anika become productive members of society. But this is a jury argument, not an appellate argument. Nothing about the district court's rulings kept Hager from presenting these contentions to the jury. In addition to the testimony that Tonia and Anika were allowed to give, testimony about their relationship with their father and the duration of it could have been adduced from Dr. Hill, for instance, or Dr. Mark Cunningham, Hager's future-danger expert, who had also interviewed Anika.

In sum, evidence regarding how Hager's execution might affect his daughters would have provided the jury with nothing about his character, prior record, or the circumstances of his offense. And the fact that they love him or that it is important to

them "to talk with him, see him, and have him in their lives" provides no insight, either. As such, we hold that the district court did not violate Hager's constitutional rights nor abuse its discretion in not allowing presentation of the evidence described above.

## VII.

 Hager also claims that the district court erred when it allowed the jury to be misled regarding potential sentence reductions for his co-defendants Johnson and Barnett. He specifically claims that the district court erred in the instructions that it gave on the mitigator concerning the likelihood of sentence reductions for Johnson and Barnett. As observed above, a district court's "decision to give (or not to give) a jury instruction ... [is] reviewed for abuse of discretion." *Russell,* 971 F.2d at 1107. A district court's decision not to give a criminal defendant's requested instruction amounts to reversible error only if the instruction: (1) was correct, (2) was not substantially covered by the charge that the district court actually gave to the jury, and (3) involved some point so important that the failure to give the instruction seriously impaired the defendant's defense. *Lewis,* 53 F.3d at 32. Even if these factors are met, however, failure to give the defendant's requested instruction is not reversible error unless the defendant can show that the record as a whole demonstrates prejudice. *See Ellis,* 121 F.3d at 923.

Before the trial of this case, both Johnson and Barnett pled guilty and agreed to testify against Hager. Both were sentenced before Hager's trial to a term of life imprisonment, although they understood the potential of a sentence reduction pursuant to Rule 35 of the Federal Rules of Criminal Procedure.

At trial, Johnson admitted that he was hoping to receive a reduction of his sentence in exchange for his cooperation with the government. On direct examination, Johnson agreed that the government was "obligated" to file a motion to reduce his sentence and, although he hoped to receive a sentence reduction, the district court would ultimately make that decision. On cross-examination, Johnson conceded that the district court could reduce his sentence to probation "if the judge decided that was the right thing to do." When asked whether he was "hoping for as big a reduction in [his] sentence as [he] possibly [could] get," Johnson replied, "Yes."

Barnett also acknowledged that his plea agreement obligated him to cooperate with and testify for the government. He hoped for a sentence reduction in exchange. On cross-examination, he recognized that he would not receive a sentence reduction unless the government asked the district court to give him one.

During the government's closing argument at trial, the prosecutor stated, "[Johnson and Barnett] came in here and testified because they pled guilty. They have been sentenced to life. Life. Are they seeking some type of a reduction? Yes. But they have pled guilty to this offense and have been sentenced to life." Then, at the sentencing summation, Hager's counsel argued that Johnson and Barnett would "some day walk out of prison. They are both going to get sentence reductions because the government is going to ask the Court to reduce their sentences, because they cooperated." The government stated in its summation that, because they were juveniles at the time of White's murder, "legally, they can't face the death penalty." It also noted,

> The fact they expect, at some point, that there may be some benefit for their testimony, nothing wrong with that.

They weren't the ones who directed this, that orchestrated it. They weren't the ones who called the shots.

But for Tommy Hager, this crime would have never been committed. He is the one who is most culpable. He is the one who, as an adult, not as a juvenile, committed this heinous offense.

Approximately two years after Hager's trial, the government filed Rule 35 motions asking for sentence reductions for both Johnson and Barnett, which the district court ultimately granted. At the Rule 35 hearing, the district court heard from White's family, who disagreed with any sentence reduction for Johnson and Barnett. Even so, the district court reduced both Johnson's and Barnett's sentences to twenty five years' imprisonment each.

In phase three of the trial, Hager submitted to the district court proposed separate mitigators, one for Johnson and one for Barnett, that referenced their possible sentence reductions: "[T]he expectation that the government will ask the Court to reduce [Johnson's and Barnett's] sentence at the conclusion of this case is something that weighs against imposition of death for Thomas Morocco Hager." Instead, as presented to the jury, number five of the nonstatutory mitigating factors asked the jurors to indicate whether "[t]he fact that Lonnie Barnett's plea agreement includes the possibility that the government will ask the Court to reduce his sentence is something that weighs against imposition of a sentence of death for Thomas Morocco Hager." No juror indicated that it did. Number six of the non-statutory mitigating factors asked the same question regarding Arlington Johnson. Again, no juror indicated that it did.

Hager complains that the district court erred in deciding that the wording of these proposed mitigators should be changed to refer to the "possibility" rather than the

"expectation" that the government would ask that Johnson's and Barnett's sentences be reduced. Hager also claims error in the district court's decision not to inform the jury that it "ha[d] never refused to reduce a defendant's sentence in such circumstances when asked to do so by the government." Finally, Hager contends that the district court erred in its refusal to include as one of the mitigators "[t]he favorable plea agreement offered to Lonnie Barnett in this case, including even a recommendation for a sentence far less than life imprisonment." Hager claims these alleged errors misled the jury into thinking that Johnson and Barnett would serve life sentences.

As to the Rule 35 issue, Hager avers that the district court thought that it was legally bound to dramatically reduce Johnson's and Barnett's sentences in exchange for their substantial cooperation. According to Hager, the district court "was fully aware of [their] cooperation and the legal factors governing Rule 35 motions at the time of Hager's sentencing hearing, and that it had granted comparable reductions in similar murder cases." Thus, Hager contends, it knew or should have known that a sizeable reduction was more than just a "possibility." Hager states, "[T]hey were, practically speaking, foregone conclusions. At a minimum, they were certainly reasonable expectations, as the defense mitigating factors (and accompanying instruction) would have let the jurors consider."

We decline Hager's invitation to find any error here. Simply stated, there was no deception of the jury. As noted above, both Johnson and Barnett testified that they hoped to receive a sentence reduction. Johnson testified that the government was "obligated" to ask for a reduction, and he agreed that the district court could even give him a probationary sentence "if the

judge decided that was the right thing to do." In addition, from Barnett's plea agreement, the jury knew that the government had recommended a sentence of much less than life for Barnett before any cooperation on his part.

Hager makes much of the distinction between "possibility" and "expectation." Hager's proposed instructions regarding mitigation state that Johnson's and Barnett's plea agreements include "the expectation that the government will ask the Court to reduce [each of their] sentence[s] at the conclusion of [the] case." But, as the government observes, his proposed instructions also requested that the court charge the jury that Johnson and Barnett "face the possibility of release in the future from confinement." Moreover, not only was Hager allowed to argue to the jury that a sentence reduction was expected; the government actually referred to Johnson's and Barnett's expectation of a sentence reduction: "The fact they expect, at some point, that there may be some benefit for their testimony, nothing wrong with that."

Concerning Hager's contention that Johnson's and Barnett's sentence reductions were "foregone conclusions" at the time of Hager's trial, we disagree. There was no way for anyone to predict the extent of the sentence reductions or even if either Johnson or Barnett would receive one. For example, what if the government had determined that they had not been truthful, as required by their plea agreements? Or, what if the heinousness of the crime and White's family's objection to any sentence reduction had so affected the district court that it balked at granting the Rule 35 motion—or granted only a small measure of relief?

We have made a searching review of the sealed transcript of the Rule 35 hearing and come away with the firm opinion that

the district court seriously contemplated whether to grant the Rule 35 motions for Johnson and Barnett. There is nothing in the transcript to suggest that it took the decision lightly or that the determination was preordained. Any contention to the contrary is without merit.

Hager also briefly makes a constitutional argument that in allegedly misleading the jury regarding Johnson's and Barnett's sentences, the court violated "Hager's rights to due process and to a reliable sentencing under the Fifth and Eighth Amendments and statutory law." For the same reasons that we reject his arguments above, we reject his constitutional arguments, as well.

## VIII.

 Hager states that the district court also erred when it denied his challenge to the future dangerousness aggravating factor. "The constitutional validity of aggravating factors is a question of law subject to de novo review." *United States v. McCullah,* 76 F.3d 1087, 1107 (10th Cir. 1996). We review evidentiary matters, however, for an abuse of discretion. *Basham,* 561 F.3d at 326.

 "Future dangerousness is best defined as evidence that a defendant is 'likely to commit criminal acts of violence in the future that would be a threat to the lives and safety of others.'" *Basham,* 561 F.3d at 331 (quoting *United States v. Bernard,* 299 F.3d 467, 482 (5th Cir.2002)). "The Supreme Court has recognized future dangerousness as a legitimate aggravating factor in capital proceedings." *Id.*

Hager maintains that the jury here "confronted the issue of his future conduct in a maximum-security federal penitentiary, a setting specifically designed, organized, and staffed to handle inmates who have been convicted of violent crimes."

According to Hager, "The Supreme Court has never squarely considered the reliability of such judgments under the Constitution or federal death-penalty statutes." We are unmoved by the argument.

As a matter of constitutional law, the Supreme Court has long held, "What is important at the selection stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." *Zant v. Stephens*, 462 U.S. 862, 879, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). Regarding the weight that should be accorded to the evidence, that is a matter for the jury to decide.

Hager makes much of his evidence that allegedly demonstrates that future dangerousness cannot be reasonably predicted. But this is an argument for the jury. In fact, Hager presented this argument to the jury, but the jury rejected it. Instead, as we have already noted, the jury unanimously found all of the statutory and non-statutory aggravators presented to it. Nevertheless, Hager continues to argue that the jury's finding as to his future dangerousness is speculative. We are wholly unconvinced. Perhaps we might someday be presented with a case in which we are persuaded that the evidence presented as to a defendant's future dangerousness was merely speculative or that it was constitutionally infirm. But, this is not such a case.

■ Hager also makes two other arguments in this section that we address briefly. First, he claims that he was unfairly harmed by a question the government asked of Dr. Cunningham. Dr. Cunningham had earlier testified about the "catastrophically cumulative effect" that Hager's upbringing had on his behavior as an adult. After having Dr. Cunningham agree that "there is nothing he can do to change that catastrophically cumulative effect," the government asked, "So if he is prone to violence at 20, he is always going to be prone to violence because of that catastrophically cumulative effect?" Hager suggests that "the force of the prosecutor's logic may have persuaded jurors to treat mitigating evidence about Hager's horrific childhood as proof of his future dangerousness." But, the government's argument merely called upon the jury to do what capital sentencing juries do: They consider evidence—both mitigators and aggravators-and decide which deserves greater weight. And to the extent that certain evidence cuts both ways, both the government and the defendant are both harmed and helped.

Second, Hager offers that his case was an example of "how future dangerousness risks becom[e] a proxy for subconscious racial fear and other biases.... [T]he prosecutor stoked such fears by baselessly suggesting to the predominantly white Virginia jury that Hager, an African–American man ... was a member of a violent, nationwide prison gang that called themselves 'the D.C. Blacks.'" As discussed in the next section, we reject this contention as well.

Having considered Hager's arguments, we find no constitutional error or abuse of discretion as to this issue.

## IX.

■ Hager also avows that the district court erred in admitting evidence as to his future dangerousness. Because he did not raise this issue with the district court below, our review is for plain error. *See Martinez*, 277 F.3d at 524. As stated above, to receive relief under the plain error standard, a defendant must demonstrate "(1) error, (2) that is plain, and (3) that affect[s] substantial rights." *Thomas*, 669 F.3d at 424 (alteration in original) (quoting *Johnson*, 520 U.S. at 466–67, 117

S.Ct. 1544) (internal quotation marks omitted). Even if he satisfies these conditions, we retain discretion regarding whether to correct the error, and we will "exercise that discretion only if the error 'seriously affects the fairness, integrity or public reputation of judicial proceedings.'" *United States v. Knight*, 606 F.3d 171, 177–78 (4th Cir.2010) (quoting *Olano*, 507 U.S. at 732, 113 S.Ct. 1770.).

■ First, Hager argues that, as to the March 15, 2003, fight at U.S.P. Pollock involving an inmate named Holstic, the testimony of Bureau of Prisons (BOP) Investigator John Feeney was based on "interviews with unnamed inmates" that occurred after the fight and Feeney's "review of a grainy videotape." Feeney was away from the prison at the time of the fight. But because he "lived about five minutes away from the prison," he "was one of the first people there that was off duty." Although he agreed that he saw Hager involved in the fight, he later stated that he "learned that staff caught the tail end of a fight involving multiple inmates." Thus, as the government admits, this leaves it "somewhat unclear how much he learned from personal observation."

■ "The relevant inquiry, however, is not whether the [testimony] was admissible under the Federal Rules of Evidence (which do not apply in capital sentencing proceedings), but whether the [testimony] was so unreliable that its admission violated due process." *United States v. Fulks*, 454 F.3d 410, 436 (4th Cir.2006). "[T]he fact that some of such evidence may have been 'hearsay' does not necessarily undermine its value—or its admissibility—for penalty phase purposes." *Sears v. Upton*, —— U.S. ——, 130 S.Ct. 3259, 3263, 177 L.Ed.2d 1025 (2010).

Although we are unable to say whether it was error to admit this testimony, we are also unable to say that any alleged error was plain. After all, Hager does not dispute his participation in the fight, and he cannot establish that the witnesses to the prison assaults lacked sufficient personal knowledge. Hence, because we cannot say that the evidence was so unreliable as to violate his due process, we find no plain error.

Hager also contends that the district court plainly erred in allowing testimony concerning a fight that occurred on June 29, 2004, at U.S.P. Pollock involving another inmate, Starks. According to testimony from BOP officials Bruce Davidson and Feeny, Hager stabbed Starks during the altercation, although the final report characterized the incident as only a fight. The officials were cross-examined on this discrepancy. Although Hager invites us to find plain error here, we decline to do so. Simply stated, this was an issue for the jury to decide.

■ Hager also brings a Confrontation Clause argument concerning certain testimony about his prison violence. But, even if there is some error on this front, "we cannot say that the error was plain [because] it even now remains unclear whether the Confrontation Clause applies in [the sentencing selection phase of a capital proceeding]." *United States v. Higgs*, 353 F.3d 281, 324 (4th Cir.2003) (citing *United States v. Promise*, 255 F.3d 150, 160 (4th Cir.2001)) (stating that "[a]n error is plain when the settled law of the Supreme Court or this circuit establishes that an error has occurred."). Hence, because the law is not settled on this issue, either in the Supreme Court or in the Fourth Circuit, we are unable to say the district court committed plain error as to this issue.

■ Hager also argues that during the government's questioning of his future—danger expert, Dr. Cunningham, the pros-

ecutor "implied that Hager, who is African-American, was a member of an especially violent gang, organized in prisons across the country, called the 'D.C. Blacks.'" But, it was Dr. Cunningham, not the government, who introduced this term into the trial:

Q. Now, Dr. Cunningham, you would agree with me that some of the U.S. penitentiaries house more DC inmates than others; isn't that correct?

A. Yes, sir.

Q. And when we talk about DC inmates, we are referring to the inmates who originally used to be at Lorton Reformatory; is that right?

A. Well, that's one way—

THE COURT: If you know.

THE WITNESS: That would be one part of the District of Columbia inmates, those who were at Lorton at one time.

"DC," in the Bureau of Prisons is sometimes used to describe a disruptive group, the DC Blacks. Everybody who is an inmate out of the District of Columbia isn't a part of the DC Blacks in terms of representing a disruptive group within the prison.

Uhm—

By [AUSA]:

Q. Did you interview the prison officials to find out if Mr. Hager is part of that group?

A. No, sir.

Q. And you would agree with me that a number of the assaults that occurred at other facilities happened because of this DC group, isn't that right?

A. I can't speak to that in open court, because the information about rates of violence—

THE COURT: If you don't know, simply say you don't know.

THE WITNESS: Well, your Honor, I have knowledge of that, but that knowledge is under seal in another federal capital case.

Moreover, during the government's rebuttal, Pat Townsend, a BOP investigator from U.S.P. Pollock, explained that the "D.C. Blacks" were one of several prison gangs, but they were "considered more of the lower level because they're always in assaults, stealing, fighting, so forth and so on. They're considered by the inmates as the lower end of the scale."

The fact that Hager's expert is the one who introduced the term "D.C. Blacks" into the trial deals a fatal blow to Hager's contention here that it was plain error to allow the testimony. And, after the term was introduced, it was perfectly permissible for the government to ask one of its own witnesses to further describe the group. Hager's argument that the term was racially inflammatory is equally without merit, considering that it was his witness, and not the government's witness, who first employed the term. Thus, we find no plain error.

 Hager also maintains that the district court committed plain error in allowing the government's line of questioning of Dr. Cunningham regarding the assassination of a federal judge:

Q. You are from Abilene; is that right?

A. Yes, sir, I am.

Q. Have you ever been to San Antonio?

A. Yes, sir, I have.

Q. Have you testified in San Antonio?

A. I don't think so.

Q. Do you know the name of the federal courthouse in San Antonio?

A. No, sir.

Q. If I told you it was the John H. Wood Federal Courthouse, would that mean anything to you?

A. No, sir, I'm sorry.

Q. Did you know that John W. Wood was a federal judge in San Antonio?

A. No, sir.

Q. Did you know that he was killed by an individual named Charles Harrelson, the father of Woody Harrelson?

A. No, sir.

Q. And do you know that that hit was direct[ed] by the Mexican mafia out of the jail?

A. No, sir. I am unfamiliar with those circumstances.

Although Hager's counsel failed to object to this line of questioning, the district judge saw fit to sua sponte give the following limiting instruction:

> Let me just make one point, I think, clear, [AUSA]. I think I should.
>
> You elicited the testimony about Judge Wood ... to demonstrate that it does happen, it is possible.
>
> But I want you, the jury, to understand that by no means should any decision you make in this case be based at all on any concern about me or what I may be concerned about.
>
> I'm not concerned in the slightest, and you should disregard that insofar as it has anything to do with me. Forget that.
>
> All [the AUSA] was doing was simply bringing the point out to show that those things can happen. But it has nothing to do with me.

There is no dispute that the details that the AUSA recited here were inaccurate. In fact, it appears that the individual who solicited Judge Wood's assassination was not incarcerated but was out on bail on a drug case, which was pending before Judge Wood. Although the inaccurate line of questioning is disturbing, we cannot say that its introduction demands a new sentencing hearing.

From the context of the line of questioning recited above, it appears that the prosecutor was seeking to challenge Dr. Cunningham's suggestion that the BOP was able to control prison violence, not that Hager might harm the federal judge presiding over his trial. And contrary to Hager's assertion that the limiting instruction by the district court made matters worse by suggesting that he might be concerned about his safety, the district court's limiting instruction served to remove any doubt that the testimony had anything to do with him when he stated, "I'm not concerned in the slightest, and you should disregard that insofar as it has anything to do with me. Forget that."

■ "Pursuant to the cumulative error doctrine, the cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." *Runyon,* 707 F.3d at 520 (quoting *Basham,* 561 F.3d at 330). But here,

> although we recognized (and assumed) a few harmless errors, they were not widespread or prejudicial enough to have fatally infected [the defendant's] trial or sentencing hearing. The proceeding below adhered to fundamental fairness. There is overwhelming evidence of guilt in the record and any possible error did not play a role in the outcome of either phase of [the] trial. Moreover, each aggravating factor (both statutory and non-statutory) determined by the jury was well supported by the record. Finally, we cannot see how cumulative error could have caused the jury to weigh the relevant sentencing factors any differently.

*Id.* at 520 (quoting *Lighty,* 616 F.3d at 371.)

Thus, for these reasons, we find that Hager has failed to establish any plain error as to this issue.

## X.

Hager next asserts that the non-statutory aggravating remorse factor, as presented to the jury, violated his constitutional privilege against self-incrimination and lacked a sufficient evidentiary basis. We will address the arguments in turn.

██ We review de novo a constitutional claim that was properly preserved. *United States v. Malloy,* 568 F.3d 166, 176 (4th Cir.2009).

In the government's Notice of Intent to Seek a Sentence of Death, it alleged, in relevant part, the following:

> The defendant, THOMAS MOROCCO HAGER, has displayed no remorse for the murder of Barbara White; rather, the defendant bragged that by killing Barbara White and directing his co-conspirators, Arlington Johnson, Jr. and Lonnie Barnett, Jr., to participate in the killing of Barbara White, he trained Johnson and Barnett to kill.

But, the district court presented the remorse aggravator as follows: "The defendant's statements and actions following the murder of Barbara White reflect a lack of remorse." The jury unanimously found that this factor existed beyond a reasonable doubt.

Hager maintains here, as he did to the district court, that this charge placed a burden on him to testify so that he would be able to account for his present state of mind. In support of his argument, Hager maintains that the aggravator as presented to the jury was put in the present tense, "reflect," which connotes a present lack of remorse. He avers that "reflected"

would have more appropriately expressed a lack of remorse just after he committed the murder. He also complains that the district court refused to amend the factor to add "13 years ago" at the end, so as to underscore that the jury was to consider his lack of remorse only immediately after the crime.

The district court's failure to place the factor in the past tense, such that it read, "The defendant's statements and actions following the murder of Barbara White reflected a lack of remorse," does not involve a point so important that it prejudiced Hager's defense. Nor does it highlight Hager's silence at trial. Instead, it asks the jury to consider whether Hager's actions following White's murder, when viewed at the time of trial, reflect his lack of remorse. Although adding the term "13 years ago" arguably could have made the factor more clear, the district court's decision not to do so certainly does not amount to reversible error.

Hager also maintains that his constitutional right against self-incrimination was offended when the prosecutor made the following charge during his opening statement in the sentencing selection phase of the trial: "The defendant, to this day, has never expressed any remorse for the killing of Barbara White." Hager posits that this statement drew attention to his silence at trial. Hager notes that he was similarly harmed by the prosecutor's comment that "the defendant has displayed no remorse for the murder—or the defendant had displayed no remorse for the murder of Barbara White right after the killing."

██ This Court recently stated in a Federal Death Penalty Act (FDPA) opinion "that the Fifth Amendment may well prohibit considering a defendant's silence regarding the non-statutory aggravating factor of lack of remorse." *United States*

*v. Caro*, 597 F.3d 608, 630 (4th Cir.2010). But then it declined to reach the issue, holding "that any error would have been harmless." *Id.* The Court took the same approach in *Runyon*, 707 F.3d at 510, finding that any error would be harmless. And, we will do the same here. But before we do, we must briefly deal with Hager's argument that harmless review is unavailable under § 848(e)(1)(A).

As Hager points out, § 848(e)(1)(A) does not specifically grant us the authority to conduct a harmless error assessment, whereas the FDPA does, 18 U.S.C. § 3595(c)(2)(C). But nor does § 848(e)(1)(A) disallow such an analysis. We are unconvinced that the statute must specify that we can conduct a harmless error review for us to employ it. After all, Federal Rule of Criminal Procedure 52(a) provides that "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." Moreover, as Hager admits, this Court has previously reviewed jury instructions on aggravating factors for harmless error in a § 848(e)(1)(A) case. *See Tipton*, 90 F.3d at 899–900. And although there, the Court failed to address whether the statute gave it the authority to conduct such an evaluation, we do not find such omission of any moment. From our perspective, it may very well be that the reason the Court neglected to address the issue was that it did not see a reason to do so. After all, it is well established "that 'most constitutional errors can be harmless.'" *Neder v. United States*, 527 U.S. 1, 8, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 306, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)). And, although "'the Constitution entitles a criminal defendant to a fair trial,' it does not guarantee 'a perfect one.'" *United States v. Abu Ali*, 528 F.3d 210, 256 (4th Cir.2008) (quoting

*Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)).

In determining whether a constitutional error is harmless, we consider "whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Neder*, 527 U.S. at 15, 119 S.Ct. 1827 (*Chapman v. Cal.*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). In our consideration of the harmlessness of any error here, we look to *Caro*, 597 F.3d at 631, a case which is similar to the one before us now. There, after the prosecutor made remarks during his closing argument regarding the defendant's failure to express remorse, the district court instructed the jury as follows:

> The Government has alleged that Carlos David Caro has not expressed remorse for his violent acts, including the murder of Roberto Sandoval, the stabbing and attempted murder of Ricardo Benavidez, and the gang based assault at Oakdale. Remember that the defendant has a constitutional right to remain silent, and mere silence, alone, by the defendant should not be considered as proof of lack of remorse.

*Id.* at 628. Although the district court here neither gave nor was asked to give such a specific instruction, it conveyed the following admonition before submitting the case to the jury at the sentencing phase:

> And the burden is always on the prosecution to prove the existence of these factors beyond a reasonable doubt. The burden never shifts to the defendant, for the law never imposes on a defendant in a criminal case the burden or duty of calling any witnesses or of producing any evidence.
>
> . . . .
>
> And as I told you before, the defendant in a criminal case has an absolute [right]

under the Constitution not to testify. The fact that the defendant did not testify, either in the guilt, eligibility or selection phase must not be discussed or considered by the jury in any way when arriving at your verdict.

No inference of any kind may be drawn from the fact that the defendant decided to exercise his privilege under the Constitution and did not testify.

The law never imposes on a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.

This, we think, is sufficient to cure any error. And "absent some specific 'reason to doubt that the jury ... adhered to the district court's directive,' this [C]ourt will not conclude to the contrary." *Runyon*, 707 F.3d at 497 (quoting *United States v. Castillo-Pena*, 674 F.3d 318, 322 (4th Cir. 2012)).

We observe from the record that "[Hager's] affirmative conduct displaying lack of remorse was significant and telling." *Caro*, 597 F.3d at 631. As summarized in the prosecutor's closing arguments in the selection phase,

As [Hager] drove back to Southeast Washington, DC, as he bragged about killing Barbara, and the performance of his two boys, Lonnie and Arlington, Alexis was leaving a trail of tiny, bloody footprints as she searched for her mother.

. . . .

You know that in the car, as they left the crime, the defendant said words to the effect, "Can you believe that? Can you believe that bitch? She is trying to get me killed."

And then when he gets to Minnesota Avenue and Nelson, he brags to Charlie Johnson and the others that his boys, his boys went hard. They are soldiers now.

Thus, we are of the strong opinion that, "[e]ven without considering [Hager's] silence, the jury could not reasonably have reached another conclusion regarding lack of remorse." *Id.* at 631. Or, stated differently, we are certain beyond a reasonable doubt that the error that Hager complains about here did not contribute to the jury's decision to recommend a death sentence. *See Neder*, 527 U.S. at 15, 119 S.Ct. 1827.

For the reasons that we find harmless error as to Hager's constitutional claim, we also find that there is more than sufficient evidence to support the lack of remorse factor. Again, "[Hager's] affirmative conduct displaying lack of remorse was significant and telling." *Caro*, 597 F.3d at 631.

One final point on this issue: We note that in its closing argument, Hager's counsel stated, "Barbara White was killed 14 years ago. Members of the jury, you do not know how Tommy Hager feels about that today." Hence, to the extent that the prosecutor's comments highlighted Hager's failure to testify, this statement by Hager's counsel is a self-inflicted wound that potentially does the same.

Consequently, we find no reversible error as to Hager's lack of remorse claim.

## XI.

Finally, Hager alleges that the district court erred in the third phase of the trial, the selection phase, by refusing to instruct the jurors that they could recommend a death sentence only if they found beyond a reasonable doubt that the aggravating factors outweighed the mitigating ones. As already noted, a district court's decision not to give a requested instruction by the criminal defendant amounts to reversible error only if the instruction: (1) was correct, (2) was not substantially covered by the charge that

the district court actually gave to the jury, and (3) involved some point so important that the failure to give the instruction seriously impaired the defendant's defense. *Lewis,* 53 F.3d at 32. Even if these factors are met, however, failure to give the defendant's requested instruction is not reversible error unless the defendant can show that the record as a whole demonstrates prejudice. *See Ellis,* 121 F.3d at 923.

We ruled on this precise issue in *Runyon,* a FDPA case, after briefing on this case had ended. *Runyon,* 707 F.3d at 516. There, we stated that we were joining those circuits that have found that "the reasonable-doubt standard does not apply to the weighing of aggravating and mitigating factors, reasoning that that process constitutes not a factual determination, but a complex moral judgment." *Id.* (citing *United States v. Fields,* 516 F.3d 923, 950 (10th Cir.2008); *United States v. Mitchell,* 502 F.3d 931, 993–94 (9th Cir.2007); *United States v. Sampson,* 486 F.3d 13, 31–32 (1st Cir.2007); *United States v. Fields,* 483 F.3d 313, 345–46 (5th Cir.2007)). We are persuaded that the analysis there applies here. Nevertheless, we will briefly address Hager's arguments on this issue.

Here, the district court instructed the jurors in accordance with applicable federal statutory law, which states that they could impose death if they found that the aggravating factors sufficiently outweighed the mitigating ones. Specifically, 21 U.S.C. § 848(k) (repealed 1996) provides in relevant part:

> [T]he jury ... shall then consider whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or in the absence of mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death.

Still, Hager argues that this statute is unconstitutional. He primarily bases his arguments on three Supreme Court decisions: *United States v. Gaudin,* 515 U.S. 506, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995), *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

According to *Gaudin,* "criminal convictions [must] rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." 515 U.S. at 510, 115 S.Ct. 2310. "[T]he jury's constitutional responsibility is not merely to determine the facts, but to apply the law to those facts and draw the ultimate conclusion of guilt or innocence." *Id.* at 514, 115 S.Ct. 2310. *Apprendi* held that this same right applies to any sentencing factor that increases the defendant's sentence beyond the statutory maximum because, like an element of a separate crime, the sentencing factor results in a higher sentence than could be imposed for the original crime. 530 U.S. at 476, 120 S.Ct. 2348. *Ring* extended this holding to capital sentencing schemes. 536 U.S. at 589, 122 S.Ct. 2428.

 "[U]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Id.* at 600, 122 S.Ct. 2428 (alteration in original) (quoting *Jones v. United States,* 526 U.S. 227, 243 n. 6, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999)). The district court adhered to this instruction when it asked the jury to determine whether the government had proven beyond a reasonable doubt the necessary aggravating factors to establish

that Hager was eligible for the death penalty. The jury unanimously found that the government had.

Hager would have us extend the holding of *Ring* and require that the jury's weighing of aggravating and mitigating factors be done by the same beyond a reasonable doubt standard. But the Supreme Court has not set forth any such requirement. Neither will we.

### XII.

For the foregoing reasons, we affirm Hager's conviction and sentence.

*AFFIRMED*

WYNN, Circuit Judge, dissenting:

This is unquestionably a difficult case with deeply troubling facts. But this case is not about Defendant Thomas Hager's factual guilt for Barbara White's murder. Rather, the issue here is whether the prosecution of the murder—a crime that traditionally falls within the "police power" of the States—was properly brought in federal court. In particular, absent a showing that White's murder fell within the language of 21 U.S.C. § 848, Virginia has the sole authority to prosecute this case.

The district court instructed the jury that under Section 848(e)(1)(A), the federal government has concurrent jurisdiction over all murders that are "meaningful[ly] connect[ed]" to certain federal drug offenses. *Ante*, at 215. But the language of Section 848(e)(1)(A), the context in which the language is used, and the well-established principle of narrowly construing federal criminal statutes that infringe on State police powers militate against reading the statute to sweep so broadly. Because the district court improperly instructed the jury on the necessary nexus between Defendant's charged drug offense and White's murder, I respectfully dissent.

### I.

Although murder is typically a state crime, the federal government asserted jurisdiction over White's murder under Section 848(e)(1)(A), which provides:

[A]ny person engaging in or working in furtherance of a continuing criminal enterprise, or any person engaging in an offense punishable under section 841(b)(1)(A) of this title ... who intentionally kills ... may be sentenced to death....

The government did not allege that Defendant was engaged in or working in furtherance of a continuing criminal enterprise ("CCE"), which is a drug distribution organization involving five or more individuals that commits a "continuing series of violations" of federal drug laws. § 848(c). Instead, the government alleged that Defendant murdered White while engaging in a conspiracy to distribute more than 50 grams of crack cocaine in violation of Section 841(b)(1)(A). [J.A. 205]

Before trial, Defendant requested the following instruction regarding how closely connected the drug conspiracy and White's murder had to be in order to support a conviction:

You may not find the defendant guilty merely because the defendant was a member of a drug trafficking conspiracy on the day of the offense.

You may not find the defendant guilty if you find Barbara White's death merely furthered the defendant's drug trafficking.

You may only find the defendant guilty if you find ... Barbara White's death was directly related to, and an integral part of the, the underlying drug trafficking offense punishable under 21 U.S.C. § 841.

J.A. 518. By contrast, the government's proposed instruction stated that the jury must find beyond a reasonable doubt "[t]hat the intentional killing was done knowingly and was connected in a meaningful way to the drug conspiracy...." J.A. 633. Explicitly rejecting Defendant's argument regarding the scope of Section 841(b)(1)(A) and his proposed instruction, the district court instructed the jury according to the government's proposed instruction. [J.A. 1358]

During a trifurcated trial, a jury convicted Defendant of White's murder, found him death-eligible, and sentenced him to death. On appeal, Defendant contends that Section 848(e)(1)(A) contemplates federal prosecution only of defendants who kill "during some trafficking activity or at least to promote or protect the drug conspiracy." Appellant's Br. at 39. Consequently, Defendant argues that his conviction must be set aside because the district court improperly instructed the jury on the necessary nexus between Defendant's charged drug conspiracy and White's murder.[1]

## II.

### A.

Generally, we review a trial court's jury instructions for abuse of discretion. *Volvo Trademark Holding Aktiebolaget v. Clark Mach. Co.*, 510 F.3d 474, 484 (4th Cir. 2007). Claims that a jury instruction failed to correctly state controlling law, however, are reviewed de novo. *Id.* In particular, our review is de novo when the propriety of a jury instruction turns on a question of statutory construction. *United States v. Wright*, 634 F.3d 770, 774 (5th Cir.2011); *United States v. Schneider*, 14 F.3d 876, 878 (3d Cir.1994) ("A plenary standard also applies to a review of jury instructions where their interpretation turns on a matter of statutory construction.").

In construing statutes, our primary goal is to give effect to congressional intent. *NLRB v. Wheeling Elec. Co.*, 444 F.2d 783, 787 (4th Cir.1971). In ascertaining congressional intent, we always begin with the statute's plain language, "giv[ing] the terms their ordinary, contemporary, common meaning, absent an indication Congress intended [the terms] to bear some different import." *Crespo v. Holder*, 631 F.3d 130, 133 (4th Cir.2011) (internal quotation marks omitted). In so doing, "we not only look to the language itself, but also the specific context in which that language is used, and the broader context of the statute as a whole." *In re Total Realty Mgmt., LLC*, 706 F.3d 245, 251 (4th Cir.2013) (internal quotation marks omitted).

Principles of statutory construction require that when identical terms or phrases are used in different parts of the same statute, we first seek to interpret the

---

1. The government contends that Defendant failed to properly preserve his objection to the jury instruction, and thus the instruction should be reviewed for plain error. [Gov't Br. at 94–96] Although not resolved by the majority opinion, this argument is without merit. Defendant did in fact object to the "meaningful connection" instruction. [J.A. 1268] Moreover, to the extent the government argues that the target of Defendant's objection was not sufficiently clear, this Court has held that "a claim of instruction error may ... be preserved by an objection in a directed verdict motion made pursuant to Rule 29(a) of the Federal Rules of Criminal Procedure, before the jury retires." *U.S. v. Ebersole*, 411 F.3d 517, 526 (4th Cir.2005). At the close of the government's case-in-chief, Defendant moved for directed verdict under Rule 29, arguing that "the statute required proof that the killing occurred in the course of a drug transaction." J.A. 2967–68. Therefore, under *Ebersole*, Defendant's instruction objection was preserved.

terms or phrases as having the same meaning. *Id.* However, this presumption of consistent usage "yields readily to indications that the same phrase used in different parts of the same statute means different things...." *Barber v. Thomas,* 560 U.S. 474, 130 S.Ct. 2499, 2506, 177 L.Ed.2d 1 (2010); *see also, United States v. Bly,* 510 F.3d 453, 461 (4th Cir.2007). Indeed, the Supreme Court long has recognized that "[i]t is not unusual for the same word to be used with different meanings in the same act, and there is no rule of statutory construction which precludes the courts from giving to the word the meaning which the Legislature intended it should have in each instance." *Atl. Cleaners & Dyers, Inc. v. United States,* 286 U.S. 427, 433, 52 S.Ct. 607, 76 L.Ed. 1204 (1932).

Settled interpretative principles also require that we construe, to the extent possible, all parts of a statute to have meaning. *Total Realty Mgmt.,* 706 F.3d at 251. Consequently, we must "reject constructions that render a term redundant." *PSINet v. Chapman,* 362 F.3d 227, 232 (4th Cir.2004).

When a federal criminal statute regulates "traditionally local criminal conduct," courts must construe the federal statute narrowly to avoid unduly infringing on the police power reserved to the States. *Jones v. United States,* 529 U.S. 848, 858, 120 S.Ct. 1904, 146 L.Ed.2d 902 (2000) (quoting *United States v. Bass,* 404 U.S. 336, 350, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971)). Therefore, " 'unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance' in the prosecution of crimes." *Id.* (quoting *Bass,* 404 U.S. at 349, 92 S.Ct. 515).

Importantly, this "clear statement" requirement is not grounded in the Commerce Clause, which establishes the outer limit of Congress's authority to criminalize conduct. Rather, it is grounded in the doctrine of constitutional avoidance, the principle that when "choosing between competing plausible interpretations of a statutory text," courts should "presum[e] that Congress did not intend the alternative which raises serious constitutional doubts." *Clark v. Martinez,* 543 U.S. 371, 381, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005); *Jones,* 529 U.S. at 858, 120 S.Ct. 1904 (noting that the clear statement requirement is based in the doctrine of constitutional avoidance).

In the context of federal criminal laws, this clear statement requirement ensures that federal statutes do not create serious federalism concerns by unnecessarily being construed in a way that unduly encroaches on the States' police powers. *Bass,* 404 U.S. at 349–50, 92 S.Ct. 515. Consequently, absent a clear indication that Congress intended to criminalize certain conduct, courts should not read a federal criminal statute as extending to the full limit of Congress's power under the Commerce Clause. *Id.; see also* John S. Baker, Jr., Jurisdictional and Separation of Powers Strategies to Limit the Expansion of Federal Crimes, 54 Am. U.L.Rev. 545, 564–65 (2005) (noting that traditionally "the great Commerce Clause cases had nothing to do with crime" because "the Supreme Court often separated criminal cases based on the Commerce Clause by use of narrow statutory construction in order to avoid the constitutional issue").

The clear statement rule also is grounded in the rule of lenity, which requires that " 'when [a] choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoke in language that is clear and definite.' " *Jones,* 529 U.S. at 858, 120 S.Ct. 1904

(quoting *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 221–22, 73 S.Ct. 227, 97 L.Ed. 260 (1952)); *see also United States v. Hilton*, 701 F.3d 959, 969 (4th Cir.2012).

### B.

These interpretative principles guide our determination of whether the district court's "meaningful connection" instruction was proper. As always, we should begin with Section 848(e)(1)(A)'s plain language, which informs us that the statute can be broken up into three prongs. *Ante*, at 179–80 (citing *United States v. Aguilar*, 585 F.3d 652, 657 (2d Cir.2009)).

The first prong covers individuals "engaging in ... a [CCE]." § 848(e)(1)(A). The statute defines being "engaged in a [CCE]" as "occup[ying] a position of organizer, a supervisory position, or any other position of management" and "obtain[ing] substantial income or resources" from the CCE. § 848(c)(2)(A)–(B). Thus, under the plain language of the statute, a "manage[r]" or "supervisor[ ]" of a CCE—essentially a "kingpin," *Chapman v. United States*, 500 U.S. 453, 467, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991)—is subject to federal prosecution for any murder he commits while in that position, regardless of how closely it is related to the CCE.

Concerned that CCE kingpins would be subject to unrestricted federal murder liability regardless of how closely connected a murder was to their drug enterprise, and, consequently, that the statute would run afoul of the Commerce Clause, federal courts have read in a requirement that there be a "substantive connection" between the murder and the CCE to fall within the scope of the first prong of Section 848(e)(1)(A). *See, e.g., United States v. Desinor*, 525 F.3d 193, 202 (2d Cir.2008); *United States v. Tipton*, 90 F.3d 861, 887 n. 13 (4th Cir.1996). Importantly, the "substantive connection" requirement does not derive from an interpretation of the statutory "engaging in" language, but rather has been inferred by courts to avoid Constitutional concerns. *Aguilar*, 585 F.3d at 661 (characterizing the "substantial connection" requirement as "judicially implied"); *see also Tipton*, 90 F.3d at 887 n. 13 (noting that the "substantive connection" element is "implied" by courts). Section 848(e)(1)(A)'s second prong encompasses individuals who are not "kingpins," but who commit murders while "working in furtherance of" a CCE. Thus, unlike with kingpins, mere participation in the CCE is insufficient to support federal jurisdiction for murders committed by a CCE underling—the murder must be made while "working in furtherance of" the CCE. For purposes of Section 848(e)(1)(A), a defendant is "working in furtherance of a [CCE]" if, at the time of the killing, he is "working to promote or advance the interest of a [CCE]." *United States v. Cooper*, 19 F.3d 1154, 1165 (7th Cir.1994). This prong primarily covers CCE underlings, *see, e.g., United States v. Ealy*, 363 F.3d 292, 295–96 (4th Cir.2004), but also encompasses situations in which a CCE hires "henchmen ... who commit murder to further [the] drug enterprise in which they may not otherwise be intimately involved." *United States v. McCullah*, 76 F.3d 1087, 1103 (10th Cir.1996).

The third prong, under which Defendant was convicted, covers individuals "engaging in" drug manufacturing, distribution, or importation crimes punishable under Section 841(b)(1)(A). The third prong potentially implicates a far broader swath of defendants than either of the first two prongs because it encompasses drug distribution organizations composed of less than five persons—even single distributors fall under its language—and it does not require that the defendant have committed a

continuing series of violations—a single violation may suffice.

Although like the first prong, the third prong requires the actus reus "engaging in," unlike with the first prong, the statute does not explicitly define what it means to be "engaging in an offense punishable under section 841(b)(1)(A)." *See* § 848. Congress's decision to explicitly define "engag[ing] in" in the first prong in a manner that is facially inapplicable outside of the context of CCEs indicates that Congress did not intend for "engaging in" to be interpreted the same way in the third prong. *Barber*, 130 S.Ct. at 2506. Thus, we cannot take our usual approach of consistently defining "engaging in" across both prongs. *Id.*

Because we cannot interpret "engaging in" identically across the first and third prongs, the key question this Court is tasked with answering is how to interpret "engaging in" as it is used in the third prong. Clearly, any individual committing a substantive drug offense at the time of a murder would be "engaging in" the drug offense for purposes of the statute. *See, e.g., United States v. Davis*, 269 Fed.Appx. 318, 319–20 (4th Cir.2008) (reviewing conviction under prong three of Section 848(e)(1)(A) when victim was killed in the course of an unsuccessful cocaine exchange); *United States v. Williams*, 85 Fed.Appx. 341, 344 (4th Cir.2004) (affirming prong three conviction for murder committed during failed crack purchase).

The more difficult question involves situations, like the instant case, in which the defendant is alleged to have been "engaging in" a *conspiracy* to manufacture, distribute, or import illegal drugs. As is the case with the first prong, in the case of conspiracies, the language of the statute could be read as requiring merely a temporal connection between the murder and conspiracy—i.e. any murder committed

during the course of the conspiracy, regardless of the relationship to the conspiracy, would be subject to federal jurisdiction. Such an outcome would raise the same Commerce Clause concerns as the first prong and thus mandates, at the very least, imposition of the "substantive connection" requirement.

The remaining question, then, is whether the implicit "meaningful connection" or "substantive connection" requirement is the only nexus requirement for defendants charged under Section 848(e)(1)(A) with murder while "engaging in" a conspiracy to violate federal drug laws. Interpreting the third prong identically to the first prong, the majority opinion concludes that Congress' use of the term "engaging in" in the third prong imposes no additional nexus requirement. *Ante*, at 180–81. In so holding, the majority opinion effectively concludes that Congress intended for the third prong to reach the full scope of federal authority under the Commerce Clause. This conclusion is contrary to the plain language of the statute, well-established interpretative principles, and compelling federalism concerns.

The requisite relationship between a drug offense and a murder imposed by the term "engaging in" in the third prong is best understood by comparing it to the nexus requirement for the second prong—that a murder be committed while a defendant was "working in furtherance of" a CCE. Intuitively, "engaging in" requires a closer connection between the murder and the drug offense than "working in furtherance." This intuition is borne out in the contemporary definitions of the two terms. "Engage" is commonly defined as "[t]o involve oneself or become occupied; participate." The American Heritage Dictionary 591 (5th ed.2011); *see also* Black's Law Dictionary 608 (9th ed.2009) (defining "engage" as "[t]o employ or involve oneself;

to take part in"). By comparison, "further" is defined as "[t]o help the progress of; promote." The American Heritage Dictionary 713. "Participat[ion]" connotes a more active, closer relationship than "promot[ion]."

Regarding the relationship between the nexus requirements for prong one and prong two, the government concedes that the "in furtherance" standard is "more demanding" than the "substantial" or "meaningful" connection requirement. Appellee's Br. at 83–84. Because the third prong requires a closer nexus than the "working in furtherance" standard, it also necessarily is more demanding than the "substantial connection" standard for the first prong. Although this Court has not provided judicial gloss on the "substantive connection" standard, the Second Circuit has held that under the standard "[t]he government has no burden to establish that a drug-related motive was the sole purpose, the primary purpose, or even that it was equally as important as any non-drug-related purpose, as long as it was one purpose." *Desinor*, 525 F.3d at 202. Thus, to satisfy the third prong's nexus requirement, advancing the drug conspiracy must be the primary or predominant purpose of the murder, or the murder must have significantly advanced or promoted the drug conspiracy.

The context in which "engaging in" is used in the third prong also supports requiring more than a "substantial connection" between a murder and a drug offense. In particular, requiring a close connection between the drug offense and the murder comports with the structure of the statute: The first prong deals with "kingpins" of large-scale drug conspiracies—the most culpable drug offenders—and requires only a "substantial connection" between the murder and the CCE. The second prong deals with underlings in large-scale drug conspiracies and requires that the murder and the drug offense be somewhat more closely related-the defendant must have committed the murder while "working in furtherance of" the CCE. Although potentially serving as a basis for prosecution of CCE kingpins and underlings, *see infra*, the third prong also encompasses single distributors and defendants who only commit a single violation of federal drug laws—the least culpable drug offenders—and, based on the trend from the first two prongs, should require the closest connection between the murder and the drug offense.

One might argue that focusing on a defendant's culpability for violating federal drug laws is misplaced because Section 848(e)(1)(A) punishes defendants for murder, and a smaller scale drug offender may be just as blameworthy for a murder as a CCE member. But because Congress generally lacks authority to "regulate non-economic, violent criminal conduct," *United States v. Morrison*, 529 U.S. 598, 617, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000), Congressional power to punish murder under Section 848(e)(1)(A) is premised on a defendant's culpability for an associated drug offense, which Congress can regulate under the Commerce Clause, *Gonzales v. Raich*, 545 U.S. 1, 22, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005). Consequently, Congress's authority to punish drug-related murders stems from the murders' impact on the interstate drug trade, not the violent conduct itself. Because prong one offenders are more heavily invested in the drug trade, it makes sense that Congress would require the government to adduce less evidence linking the murder to the defendant's drug offenses: The defendant is a drug "kingpin," and thus it can reasonably be assumed that virtually all of her violent conduct is related to her drug business.

Additionally, when considered in the context of the statute as a whole, the majority opinion's construction of the nexus requirement for the third prong violates the precept that we must seek to give all elements of a statute meaning. By definition, all CCEs constitute conspiracies punishable under Section 841(b)(1)(A) because they involve an "organization" of multiple individuals that commit a series of violations of federal drug laws. *See, e.g., United States v. Jones,* 101 F.3d 1263, 1267–68 (8th Cir.1996) (finding individual participating in CCE was also engaged in conspiracy to distribute drugs). Indeed, the Supreme Court has held that a conspiracy to illegally manufacture, distribute, or import drugs under Section 841(b)(1)(A) is a lesser-included offense of a CCE. *Jeffers v. United States,* 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977); *see also United States v. Butler,* 885 F.2d 195, 202 (4th Cir.1989). By interpreting the third prong as merely requiring a "substantive connection," the majority opinion renders the first prong meaningless: All CCE kingpins simply could be convicted under the third prong because, by participating in the CCE, they necessarily are conspiring to violate federal drug laws. Rules of statutory construction require that we reject such an interpretation.[2] *Total Realty Mgmt.,* 706 F.3d at 251.

Finally, interpreting the third prong of Section 848(e)(1)(A) narrowly—and thus requiring a close connection between a defendant's drug offense and a murder—avoids unduly infringing on the police power reserved to the States. Indeed, the Constitution explicitly authorizes Congress to punish crimes in only limited circumstances, including counterfeiting, piracy and other crimes on the high seas, and treason. *See* U.S. Const. art. I, § 8, cls. 7 & 11, art. III, § 3. Though Congress has authority to establish additional federal crimes under the Commerce Clause, U.S. Const. art. I, § 8, cl. 3, it has long been recognized that the punishment of violent crime—and murder in particular—lies at the core of the States' police powers, *Cohens v. State of Virginia,* 19 U.S. 264, 426, 6 Wheat. 264, 5 L.Ed. 257 (1821) (Marshall, C.J.) (noting that Congress has "no general right to punish murder committed within any of the States"); The Federalist No. 17, (Alexander Hamilton) (noting that the Constitution reserved to the States the "administration of criminal and civil justice"). The Supreme Court recently reaffirmed this principle: "[W]e can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime . . . ." *United States v. Morrison,* 529 U.S. 598, 618, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000).

Typically, the States are jealous of their police power. *See, e.g., Virginia ex rel. Cuccinelli v. Sebelius,* 656 F.3d 253 (4th Cir.2011). But this appears not to be the case here, as Virginia seems to have willingly ceded its authority to prosecute White's murder to the federal government. Yet that acquiescence alone does not give the federal government authority to prosecute White's murder: it is our responsibility to determine whether Congress has granted us jurisdiction and ensure that

---

2. For the same reason, the government's alternative argument that the three prongs merely describe types of offenders and do not set out any nexus requirement between a murder and drug offense also fails. *See* Appellee's Br. at 85 (asserting that "[p]otentially, the 'engaging in' provision, and perhaps even the 'working in furtherance' provision, could be read as requiring no relationship beyond a temporal one"). Were the statutory language to impose no nexus requirement, the first prong would be surplusage because all CCE kingpins could simply be charged under the third prong.

federal statutes do not unnecessarily upset the federal—state balance carefully crafted by the Framers. And the majority opinion's broad reading of "engaging in" in the third prong poses federalism concerns by raising the prospect of virtually unrestricted federal murder liability for drug offenders, particularly those engaged in drug conspiracies.

Consider, for example, a drug distribution conspiracy composed of two brothers. Over a two-year period, the older brother sells small amounts of crack to end users, and the younger brother serves as his lookout. When aggregated, the crack sales are sufficient to establish liability under Section 841(b)(1)(A). One day the younger brother observes the older brother's girlfriend kissing another man. Upset that the girlfriend is being unfaithful to his brother, the younger brother immediately shoots and kills her. At the time of the shooting, the younger brother knew that killing the girlfriend also could improve his reputation for toughness in the community. Under the majority opinion's expansive construction of Section 848(e)(1)(A), the younger brother would be subject to federal prosecution for the murder because the younger brother knew that his drug conspiracy could collaterally benefit from killing the girlfriend by improving his reputation for toughness and, consequently, warding off competitors. *See Ante*, at 181 (holding that drug-related motive must only be "one purpose" behind the killing to satisfy prong three's nexus requirement).

Under such logic, *any* murder committed by a drug offender would be amenable to federal prosecution. But when faced with more than one reasonable interpretation of a federal criminal statute, we must choose the construction that least infringes on the police power reserved to the States. *Jones*, 529 U.S. at 858, 120 S.Ct. 1904.

## C.

Furthermore, the reasons cited in the majority opinion for its expansive construction of the third prong of Section 848(e)(1)(A) are unpersuasive. First, the majority opinion argues that the plain language of the statute "unambiguous[ly]" states that "[o]ne ... who intentionally kills someone while engaged in a drug conspiracy is eligible for the death penalty...." *Ante*, at 182. But even notwithstanding that the plain language of the third prong of Section 848(e)(1)(A) requires a drug offense and murder to be more than "meaningful[ly] connect[ed]," the statute is at least ambiguous as to the meaning of "engaging in" in the third prong. Congress's decision to explicitly define "engag[ing] in" in the first prong in a manner that is inapplicable outside of the context of CCEs—while leaving "engaging in" in the third prong undefined—renders the meaning of "engaging in" in the third prong ambiguous because it requires that the term be interpreted two different ways. *See In re Air Cargo Shipping Svcs. Antitrust Lit.*, 697 F.3d 154, 159 (2d Cir. 2012) (explaining that once "it has been established that a statutorily defined term has different meanings in different sections, the term standing alone is necessarily ambiguous and each section must be analyzed to determine whether the context gives the term a further meaning that would resolve the issue in dispute." (quotation marks omitted)); *see also Robinson v. Shell Oil Co.*, 519 U.S. 337, 343–44, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997).

Moreover, the statute is ambiguous because the majority opinion's interpretation renders the first prong meaningless. *See Universal Maritime Svc. Corp. v. Wright*, 155 F.3d 311, 320 (4th Cir.1998) (holding that a statute was ambiguous when an ordinary meaning interpretation would

render component of statute "meaningless"). As previously explained, when a federal criminal statute is ambiguous and potentially infringes on the police power of the States or raises Commerce Clause concerns, we must choose the reasonable construction that least upsets the federal-state balance. *See Jones*, 529 U.S. at 858, 120 S.Ct. 1904.

Second, the majority opinion suggests that its interpretation of the nexus requirement for prong three was compelled by this Court's decision in *United States v. Tipton*, 90 F.3d 861, 887 (4th Cir.1996). *Ante* at 180, 185. But the majority opinion's appeal to *Tipton* is misplaced because *Tipton* involved defendants who were convicted under prong one, not prong three, like Defendant.[3] *Tipton*, 90 F.3d at 869–70, 887. And, as previously explained, the nexus requirement for prong one is statutorily defined in a way that is clearly inapplicable to prong three cases. *See supra* Part II.B. Thus, the majority opinion neither was required to apply *Tipton* in the instant case, nor did it make sense to do so.

Finally, the only prong three case relied on by the majority opinion, the Second Circuit's decision in *Aguilar*, was legally flawed.[4] In *Aguilar*, the Second Circuit held that in third prong cases the government need only show a "substantive connection" between a murder and a drug conspiracy. 585 F.3d at 660. Although the *Aguilar* panel properly recognized that Section 848(e)(1)(A) can be broken up into three prongs, its ultimate conclusion was controlled by the Second Circuit's earlier

decision in *Desinor*. *Aguilar*, 585 F.3d at 659–60; *see also United States v. Santos*, 541 F.3d 63, 69 (2d Cir.2008) (noting that *Desinor* established the nexus requirement for prong three cases). And the *Desinor* court failed to appropriately give meaning to each of the statute's three parts by reading out the disjunctive between the CCE and small-scale drug offense clauses. *See Desinor*, 525 F.3d at 200–01 (stating that Section 848(e)(1)(A) applies to " 'any person engaging in or working in furtherance of ... [a drug] offense punishable under section 841(b)(1)(A)' " (alteration in the original) (quoting § 848(e)(1)(A))). As a consequence of this interpretive error, the *Desinor* court adopted the "substantive connection" test from an Eighth Circuit prong one case and made no attempt to interpret "engaging in" in the third prong independently. *Id.* at 202 (citing *Jones*, 101 F.3d at 1267).

In sum, in cases in which the government prosecutes a defendant under the third prong of Section 848(e)(1)(A), alleging that a murder occurred while the defendant was engaged in a conspiracy to violate federal drug laws, the government should be required to show that the defendant's predominant or primary purpose in committing the murder was to promote or advance his drug conspiracy or that the murder significantly advanced or promoted the conspiracy. Consequently, the district court erred as a matter of law in instructing the jury that only a "substantive connection" was required.

---

3. The *Tipton* defendants were charged with committing a series of murders while "engaging in and working in furtherance of" a CCE. 90 F.3d at 869, 887. The jury convicted all of the defendants of engaging in a CCE, *id.* at 869–70, and thus whether the murders were also committed in furtherance of the CCE was not essential to the jury's verdict. Regardless,

the *Tipton* defendants were neither charged nor convicted under prong three, which is the only prong at issue in this case.

4. It appears that the Second Circuit is the only federal appellate court to address the third prong's nexus requirement in a published decision.

#### D.

The remaining issue is whether the district court's improper instruction constituted reversible error. In cases where a jury renders a verdict after being misinstructed, this Court may apply harmless error analysis, and in so doing,

> must attempt to ascertain what evidence the jury necessarily credited in order to convict the defendant under the instructions given. If that evidence is such that the jury must have convicted the defendant on the legally adequate ground in addition to or instead of the legally inadequate ground, the conviction may be affirmed.

*United States v. Hastings,* 134 F.3d 235, 241–42 (4th Cir.1998).

Here, it is impossible to conclude that the district court's errant instruction was harmless. "Meaningful connection" is the least burdensome nexus requirement on the spectrum of nexus requirements linking a murder to a drug offense for purposes of the three prongs of Section 848(e)(1)(A). *See supra* Part II.B. The majority opinion approvingly quotes the *Desinor* court's holding that advancing a drug conspiracy need not be a defendant's "primary" purpose in committing a murder in order to establish a "substantive connection" between a murder and the conspiracy. *Ante,* at 181. But, as explained above, the plain language of Section 848(e)(1)(A) requires that the predominant or primary purpose of the killing must be to advance the drug conspiracy. Because all we necessarily know from the jury's verdict is that advancing his drug conspiracy was one motive behind Defendant's murder of White, the error cannot be found harmless under *Hastings.*

#### III.

In sum, nothing prevented Virginia from prosecuting this case in its courts, and even if this Court sets aside Defendant's conviction in federal court, nothing prevents the State from prosecuting it now. Perhaps the driving consideration behind prosecuting this matter in federal court was that it is not clear whether, under Virginia's capital punishment statute, this murder falls into any of Virginia's fifteen categories of death-eligible murders. Va. Code Ann. § 18.2–31. But the zeal to try a defendant capitally must not breach the Constitution's carefully crafted roles for the States and the federal government in protecting the public from violent crime.

In this case, the district court breached that role by improperly instructing the jury that the government needed to establish only a "meaningful connection" between White's murder and Defendant's drug conspiracy. That is reversible error. With great respect for the contrary view of my fine colleagues in the majority, I dissent.